MaddeN, Judge,
delivered the opinion of the court:
The plaintiff sues to recover money withheld by, or refunded to, the Government because, the Government insisted, it had overpaid the plaintiff for hauling aviation gasoline in tank trucks from Mobile and Port Birmingham, Alabama to Army airfields in that state during the years 1948 and 1944.
Under date of May 14, as supplemented on June 14, 1948, the plaintiff entered into a written contract with the Government for the transportation of an amount of aviation fuel not to exceed a specified number of gallons from tanks at the port of Mobile to Gunter Field at Montgomery, and to Courtland, both in Alabama. The tanks at Mobile belonged to the Standard Oil Company of Kentucky. The rates prescribed in the contract were the equivalent of the published interstate commerce common carrier rates for such transportation. They were higher than the Alabama intrastate published rates.
As the proposed contract was originally drafted by the Government, it contained the following provision:
* * * and provided further, that, in the event that any published rates at the date of this contract for comparable services are lower than the prices named herein, the Contractor agrees to reduce said prices to the level of any such lower published rates.
The plaintiff refused to execute the proposed contract until this provision was deleted. In negotiating for an extension of the contract, the Government’s representatives requested a reduction of the rates, pointing out that the contract rates were higher than tank car railroad rates, and higher than intrastate truck tank rates. The plaintiff refused to agree to reduce its rates.
The written contract expired on September 30, 1943. Thereafter the Government’s representatives continued to direct the plaintiff to haul gasoline from the terminal at Mobile to Gunter Field and to Courtland, and also to Maxwell Field, Tuskegee, Napier Field and Birmingham, all within the State of Alabama. On all this haulage the plaintiff billed the Government at the contract rates, and the bills were paid.
*597 The gasoline in question was bought by the Government from refineries in Louisiana and Texas. It was brought to Mobile in tankers and barges, and pumped into the tanks of the Standard Oil Company at Mobile. The Government had contracted with Standard Oil, for a fixed rate per gallop to receive the-gasoline into its tanks, store it, and deliver it, on the Government’s orders, into tank cars, tank trucks or barges for further transportation. Standard Oil was privileged to commingle the Government’s gasoline with other gasoline of the same quality. The ocean tankers held from 60,000 to 75,000 barrels, and came to the Standard Oil terminal two or three times a month. The capacity of the terminal was in excess of 100,000 barrels. No shipment moved through the terminal on a through bill of lading from its origin in Louisiana or Texas to any point beyond Mobile. The gasoline moved out of the terminal at Mobile on separate requests for the filling of tank trucks or railroad tank cars, and each such movement was on a new and separate bill of lading. When the gasoline was shipped from the refineries in Louisiana and Texas, all that was known of its future course was that it would be unloaded at the Standard Oil terminal in Mobile, and that most of it would be later transported to one or another of several destinations in Alabama.
The gasoline hauled by the plaintiff from Port Birmingham, Alabama, was received by the plaintiff from the terminal of Southport Petroleum Company. Southport had .a contract with the Government under which Southport agreed to transport by barge Government-owned gasoline from the Texas City, Texas, area to Southport’s terminal at Port Birmingham, receive it there, and later deliver it into transportation equipment as the Government might direct. Beginning about September 6, 1943, the Government caused Southport to deliver gasoline to the plaintiff’s tank trucks, which delivered the gasoline to Gunter Field, Maxwell Field, Tuskegee, Courtland, Napier Field and Birmingham, all within the State of Alabama.
For the transportation from Port Birmingham, the parties never made a written contract. ^Representatives of the parties met with the District Supervisor of the Interstate Commerce Commission at Birmingham to obtain an opinion *598 as to whether the plaintiff’s transportation was interstate commerce or intrastate commerce. Upon the basis of the information given the Supervisor, the information perhaps not being entirely correct, he gave his opinion that the plaintiff’s hauling was in interstate commerce. The purpose of this consultation was to determine what rates 'should be applicable. The plaintiff billed the Government at interstate rates for the transportation from Port Birmingham and the bills were paid.
The plaintiff had no permanent license to be a common carrier in interstate commerce of petroleum products in tank trucks during the period in question. It had a temporary license for such hauling for one month from Port Birmingham and for four months from Mobile. It had no license at all as a contract carrier in interstate commerce from the two ports. It had a license for such transportation as a common carrier in intrastate commerce.
In the plaintiff’s 1943 written contract some 10 specific obligations were imposed upon it which are not normal obligations of a common carrier. They are recited in finding 33.
If there had been no contract involved in the instant case, the properly applicable rates would have been the published Alabama intrastate rates. The gasoline in question had been shipped from Louisiana or Texas refineries, by tankers or barges, on bills of lading showing its destination to be the Standard Oil terminal at Mobile or the Southport Company’s terminal at Port Birmingham. It was intended to remain at the terminal until the Government’s agents should, from time to time, direct the terminal to deliver various quantities of it into tank trucks or tank railroad cars to be carried to such of several possible destinations as the Government agent should direct. The length of time it remained at the terminal depended upon the needs of the Government from time to time, at the airfields where the gasoline was to be consumed.
The situation was, in all essential respects, like that presented to the Supreme Court of the United States in Atlantic Coast Line, Railroad Co. v. Standard Oil Co. of Kentucky, 275 U.S. 257. In that case Standard Oil caused petroleum products to be brought by water transportation from Lou *599 isiana and Mexico to Standard’s terminals on the coast of Florida. From the terminals it was pumped into railroad tank cars, and carried by the railroad to Standard’s bulk stations and service stations in Florida. Tire railroad sought to collect interstate rates for this transportation. The Court held that the intrastate rates were applicable. It said at page 271 that the delivery of the oil from the ocean tanker to Standard’s terminals was a “closing of an interstate or foreign transportation and a beginning of intrastate distribution for the purposes and business of” Standard. Atlantic Coast Line Railroad Co. v. Standard Oil Company of New Jersey, 12 F. 2d 541 (CCA 4), is to the same effect. The Interstate Commerce Commission has, of course, followed the Supreme Court ruling. Ex Parte No. MC-48, 71 M.C.C. 17, issued March 7, 1957. The Commission, in its decision, properly distinguished such cases as Stafford v. Wallace, 258 U.S. 495 and Standard Oil Co. v. Federal Trade Commission, 340 U.S. 231, on the ground that those cases involved “criteria employed by the courts in a consideration of the constitutionality or remedial purposes of other statutes” not involved in the cases before the Commission. These rate cases do not, like many cases relating to the commerce power, of which Stafford v. Wallace, supra, and National Labor Relations Board v. Jones and Laughlin Steel Corp., 301 U.S. 1, are examples, involve an attempt by Congress to exercise that power to its ultimate Constitutional limits. They are concerned only with such reach of the power as Congress has actually exercised or has given the Commission the power to exercise, in the statutes governing transportation.
Having concluded that the legally applicable rates, in the absence of special circumstances, would have been Alabama’s intrastate rates, we must determine whether the written contract, and the course of dealing of the parties, removed their obligations from that normal legal situation.
As to the transportation from Mobile during the term of the written contract, that is, down to September 30,1943, we think the plaintiff was entitled to the contract rates. The United States is free to contract for rates for intrastate transportation other than those set by State regulatory bodies. Public Utilities Commission of California v. United States, *600 355 U.S. 534; Union Transfer Company v. United States, 144 C. Cls. 43; Hughes Transportation, Inc. v. United States, 144 C. Cls. 200, cert. denied in both cases, 359 U.S. 968. The litigated cases on this question have been cases in which the United States has contracted for rates less than the State scheduled rates. But we see no reason why, if the Government desires services or privileges in addition to those which a common carrier is obliged to render or accord to a shipper, it may not, under those decisions, validly contract to pay a higher rate than the common carrier rate.
At the time the Mobile contract expired on September 30, 1943, the situation was that the Government had requested a reduction of rates and the plaintiff had refused the reduction. After September 30, the Government continued to give the plaintiff gasoline to haul, the plaintiff hauled it, billed the Government for the contract rates, and the bills were paid. This course of conduct would, in ordinary circumstances, give rise to a contract, evidenced by acts rather than by written or spoken words, to continue to pay the rates of the former contract. Since, as we have seen, the Government had the power to contract for rates different from the scheduled rates, we conclude that the carriage from Mobile, after September 30, 1943, continued to be at the contract rates.
As to the plaintiff’s carriage of gasoline from Port Birmingham, there was, as we have seen, no express contract at any time. The consultation of the parties with the agent of the Interstate Commerce Commission shows that they wanted to know what was the legally applicable rate. That agent told them, erroneously, that the interstate rate was applicable. If he had advised them to the contrary, it may well be that the plaintiff would have refused to haul the gasoline, or to accord the Government any special privileges, unless a higher rate was contracted for. As it was, however, we think that if their conduct indicated any agreement at all, it was that the law, as to which they were mistaken, should take its course.
The plaintiff argues that, because of the advice received from the agent of the Interstate Commerce Commission, the parties thought that the interstate rates were applicable and *601 should be held to have agreed that they should be applicable. But contracting out of a legally fixed rate, which cannot be done at all by a private shipper, is not to be lightly assumed, even when the Government’s conduct is involved. We recognize that this means that the plaintiff does not get paid for the special services and privileges recited in the Mobile contract, which, presumably, were rendered and accorded in the performance of the carriage from Port Birmingham. We suppose that a common carrier may not perform special services for a private shipper, unless the rate schedules provide for payment for them. If it performs them, and there is no schedule of payment for them, it cannot charge the shipper for their value. The plaintiff should, then, have refused to accord special privileges to the Government without a contract to pay for them.
The plaintiff is entitled to recover the difference between the amount paid it for transportation from Mobile, and the amount which the Government, in its recoupment action, allowed it for that transportation. Judgment will be entered for the plaintiff. The amount of recovery will be determined pursuant to Buie 38 (c).
It is so ordered.
Laramore, Judge; Whitaker, Judge, and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is an Alabama corporation, and is, and has been since 1931, a common carrier by motor vehicle of certain commodities in interstate and intrastate commerce.
2. During the years 1943 to 1944, plaintiff transported aviation gasoline for the United States by motor vehicle in tank trucks from Mobile, Alabama, and from Port Birmingham, Alabama (also known as Birmingport), to certain Army airfields in the State of Alabama, and charged defendant and was paid therefor at common carrier interstate rates or their equivalent. Subsequently, and after audit of plaintiff’s bills by the General Accounting Office, defendant recovered from *602 plaintiff, either through refund or by way of setoff, during the years 1949 through 1952, overpayments on such haulage, on the ground that there were properly applicable to such transportation, intrastate rates which were less than the rates charged by plaintiff. Plaintiff sues to recover amounts so withheld or refunded, during said years in the amount of $99,353.26.
3. The parties agreed, with the consent of the Commissioner, that the trial of the case should be limited in the first instance to the question of liability, and further agreed that, to that end, there should be used as representative of the subject shipments bills of lading and vouchers covering transportation by plaintiff for defendant of such aviation gasoline between the following points in the State of Alabama:

4. On each voucher covering each of the above shipments, plaintiff’s authorized representative signed a certificate reading as follows:
I certify that the above account is correct and just; that the services have been rendered as stated; that,payment thereof has not been received, and that the rates charged are not in excess of the lowest net rates available for the Government, based on tariffs effective at the date of service.
5. The principal issues of fact and law for decision on the question of liability are deemed to be substantially as follows:
(1) .Whether defendant is contractually bound by the terms of the “Fixed Price Service Contract” dated May 14, 1943, the supplemental agreement of June 14, 1943, and the change order of August 25, 1943, to pay the rates therein *603 prescribed for services rendered during the period covered by the contract.
(2) Whether plaintiff is entitled to the same rates for the continued haulage from Mobile to the airfields named in the contract after the periods named in the contracts and change order expired.
(3) If such contract rates are not binding on the defendant, whether such transportation services were interstate or intrastate commerce.
(4) Whether defendant’s representatives agreed to pay plaintiff, for haulages from Birmingport, at the applicable interstate rate and whether defendant is bound by such agreement.'
(5) If defendant’s representatives did not agree to pay the applicable interstate rate or if defendant is not bound by such agreement, whether the haulages from Birmingport were interstate or intrastate commerce.
(6) The applicable common carrier rates in each instance.
FACTS RELATING TO TRANSPORTATION FROM MOBILE
6. Under date of May 14,1943, plaintiff entered into a contract with the defendant for the transportation of aviation fuel from the Standard Oil Company’s terminal at Mobile, Alabama, to Gunter Field, at Montgomery, Alabama, and from Panama City, Florida, to the Army airfield at Tuskegee, Alabama, the contract covering the period from March 17, 1943, to June 30, 1943, for shipments from Mobile, and the period from March 15,1943, to June 30,1943, for shipments from Panama City. It required the transportation of not more than 3,696,000 gallons from Mobile to Gunter Field, and not to exceed 300,000 gallons from Panama City to Tuskegee, when and as the Government’s contracting officer should so direct. No controversy exists with reference to rates from Panama City to Tuskegee. The contract was negotiated in April 1943. This contract was amended by a supplemental agreement dated June 14,1943, to provide for the additional transportation of 1,000,000 gallons of aviation fuel from Mobile to the airfield at Courtland, Alabama, and for additional transportation from Panama City.
*604 By change order dated August 25, 1943, the time for completion of the contract was extended from June 30, 1943, to September 30,1943.
The contract stated that it was negotiated under the authority of the First War Powers Act, 1941 (55 Stat. 838), and Executive Order No. 9001 of September 27, 1941, and was executed by the Government “in the prosecution of its war effort.” It stated the Government deemed it necessary to contract “for the transportation of aviation fuels and lubricants from the source of such materials to the points where the Government requires the use of the same,” and that, because of the inadequacy of Government facilities, the execution of the agreement would “promote the interests of the Government and facilitate the prosecution of the war.” Though dated May 14,1943, it covered the transportation of aviation fuel for a period beginning in March 1943, and specifically stated that transportation services rendered prior to the execution of the contract were at Government request, and were in contemplation of and subject to the provisions of the contract.
The contract also included the following provisions:
Article 4 recited that title to all aviation fuel so transported should be and remain in the Government.
Article 5 relieved the carrier from liability for loss, destruction or clamage to Government property in the carrier’s possession or control, except such as resulted from “wilful misconduct or failure to exercise good faith.”
Article 7 permitted inspection of the carrier’s facilities and operations by Government inspectors “at all times”; gave Government representatives access to all the carrier’s accounting records; and required that the method of accounting be subject to approval of the Government, and that a separate system of accounts be set up for work under the contract, to be preserved for at least three years after completion of the contract.
Article 12 forbade the carrier to discriminate against its employees because of race, creed, color, or national origin.
Article 13 required the carrier to assume responsibility for safeguarding all secret, confidential and restricted matters connected with the contract, and forbade the carrier to mention the existence of the contract *605 in any application to the Securities and Exchange Commission, without Government consent.
Under Article 15, the contract was subject to termination at any time for the convenience of the Government.
Article 16 required that disputes, concerning questions of fact, be submitted to the contracting officer and that the decision of a Government representative thereon would be conclusive.
Article 21 required immediate notice to Government representatives of any actual or potential labor disputes which were delaying or threatening to delay timely performance of the contract.
Under Article 22, the Government representatives could require at any time that additional protective equipment and personnel be supplied.
Article 23 required renegotiation of the contract price to eliminate excessive profits, and in that connection the carrier was required to supply the Government with such financial data as it should require and to permit such audits and inspections of its records as the Government might request.
The rates prescribed by the contract and the supplemental agreement for the transportation of aviation fuel from Mobile were as follows:

Interstate Commerce Commission rates, based on tariffs, treat a gallon of gasoline as weighing 6.6 pounds or 15.15 gallons per hundredweight.
7. As this contract was originally drafted by defendant it contained the following provision:
* * * and provided further, that, in the event that any published rates at the date of this contract for comparable services are lower than the prices named herein, the Contractor agrees to reduce said prices to the level of any such lower published rates.
Plaintiff refused to.execute the contract until this provision was deleted. At the same time plaintiff advised defendant that-the rate it was charging was a class rate; that there were some point-to-point rates in effect from Mobile to Montgomery that could be made applicable to either Gunter Field or Maxwell Field; but that in plaintiff’s opinion *606 such rates were not compensatory. In both interstate and intrastate tariffs applicable to transportation of this commodity by common carrier, applicable commodity, point-to-point rates take precedence over class rates.
8. By supplemental agreement dated June 14, 1943, the following provision was added to plaintiff’s contract:
(3) The Contractor shall, during the period beginning February 1,1943, and ending June 30,1943, transport not to exceed 1,000,000 gallons of Grade 87 aircraft engine fuel from the terminal of the Standard Oil Company of Kentucky, located at Mobile, Alabama, to Government storage at Courtland, Alabama, when and as the Government, represented by the Contracting Officer, shall so direct, at the unit price of $0.03828 per gallon and at the total price of not to exceed $38,280.00.
The contract rates per hundredweight at the accepted weight of 6.6 pounds per gallon were as follows:

Mobile to Courtland_ CO
These rates were the equivalent of the published interstate common carrier rates.
9. By Change Order approved August 25,1943, plaintiff’s contract was extended from June 30, 1943, to September 30, 1943. During the period of negotiation and extension defendant advised plaintiff that its rates were excessive, in that they were considerably higher than the rail rate in tank cars or the common carrier highway rate, and requested that consideration be given to their reduction. Plaintiff refused to reduce the contract rates.
10. The extended period in plaintiff’s contract expired on September 30,1943, and no other fixed-price service contract was negotiated by the parties. However, plaintiff continued to haul aviation gasoline for defendant from the Mobile terminal to Gunter Field and to Courtland, and charged defendant for such service at the equivalent of the respective interstate rates of 43«¡5 and 580 per hundredweight, which charges were paid by the defendant.
At the request of defendant, plaintiff also transported aviation fuel from the Standard Oil Company terminal at Mobile to the following airfields, and plaintiff billed defendant and was paid at the following rates, which were *607 equivalent to the published interstate common carrier rates for such transportation:

11. The Government-owned aviation fuel which plaintiff transported from Mobile was stored and handled for defendant by Standard Oil Company of Kentucky at its terminal facilities at that point under a fixed-price service contract which provided, among other things, as follows:
Article 1 — Scope of This CoNtract
(a) The Contractor shall furnish and supply to the Government storage and handling facilities at the points indicated in Exhibit “A”, which is hereto attached, and hereby made a part hereof, and render services in. connection therewith, as hereinafter more particularly described, in receiving, storing, handling, loading and delivering Government-owned fuel. Said services shall be performed when and as, during the period beginning January 1, 1948 and ending June 30, 1943, the Government shall request and direct Contractor to supply the same. Said services shall be as follows:
(1) To order Government-owned stocks of fuel to be shipped to Contractor’s terminals or bulk plants from such sources as may be directed by the Contracting Officer.
(2) To receive Government-owned stocks of fuel into Contractor’s bulk plants and terminals for storage as required by instructions issued by the Contracting Officer.
(3) To deliver Government-owned stocks of fuel from Contractor’s bulk plants and terminals in such manner or to such destinations as may be directed by the Contracting Officer.
* * $ H* #
(j) In the event the necessity therefore arises the Contractor may commingle Government-owned stocks of fuel handled under the terms hereof with other stocks of fuel in its terminals or bulk plants provided that such other stocks have been received in properly sealed conveyances and taken from stocks which have been analyzed and found to satisfy the same specifications as the Government-owned stocks with which such other stocks are commingled. At any terminal or bulk plant where such commingling takes place, Contractor shall keep separate *608 records for all fuel handled under the terms of this contract.
The contract provided for the payment to the contractor of a fixed rate per gallon for storage and handling, including the delivery by the contractor of such fuel into tank cars, tank trucks or barges. Through change orders and supplemental agreements to this contract, and through an additional contract with supplemental agreements, Standard Oil Company of Kentucky performed such storage and handling services for defendant to and including June 30, 1944.
12. At its Mobile terminal, Standard Oil Company of Kentucky had one 55,000-barrel storage tank, two 20,000-barrel storage tanks, and some 5,000- or 10,000-barrel tanks, which was a total of more than a 100,000-barrel capacity, and which at 42 gallons to the barrel was a capacity in excess of 4,200,000 gallons. The aviation gasoline was brought in by various carriers, not including Standard Oil Company of Kentucky, in tankers and barges from points in Texas and Louisiana. The tankers held from 60,000 to 75,000 barrels, and came into the terminal two or three times a month.
Shipments of gasoline of the same grade coming into the terminal from different points of origin were commingled. None of the gasoline was specifically designated for shipment to any specified point beyond the terminal. When it was received, the terminal operator did not know where it would be shipped beyond that point but he knew it belonged to the defendant. The fuel remained in the tanks only a short time before it was transferred from the tanks and carried to the various destinations on orders of defendant. The tanks were a part of the shipping program and were utilized to implement the expeditious flow of gasoline to the airfields pursuant to the desire and directions of the defendant. At times Army convoys took gasoline directly from the terminal.
No shipment moved through the terminal on a through bill of lading but, as to the fuel transported to the airfields by plaintiff, the terminals were utilized to provide the flexibility needed to maintain a constant and expedited flow *609 from source to user. Distribution beyond the terminal was controlled by specific individual requests, and each shipment moved out of the terminal on a separate Government or commercial bill of lading. Gasoline moved from the terminal in railroad tank cars as well as in tank trucks. Some shipments were apparently diverted by defendant and made by barge to Southport Petroleum Company’s terminal at Birmingport. All transports were sealed either with Government or Standard Oil Company seals. The gasoline was Government inspected when it was placed in the terminal storage tanks; and it was inspected at its next destination after distribution from the terminal. While the terminal operators were subject to call 24 hours a day, seven days a week, the operations at this terminal were principally limited to day work.
13. Eates applicable to the transportation by motor vehicle of petroleum and petroleum products by common carrier in interstate commerce from Mobile were as follows:

14. The intrastate rates for this transportation by plaintiff from Mobile were the following commodity, point-to-point rates, based upon Alabama Motor Tariff Bureau, Agent, Motor Freight Tariff No. 1, A. P. S. C. No. 1, Index 10275, effective December 1, 1942, to December 14, 1942; supplement 8 thereto, Index 10290, effective December 15, 1942, to May 23,1943; Index 10275 effective May 24,1943, to November 14, 1943; Alabama Motor Tariff Bureau, Agent, Motor Freight Tariff No. 1-A, Mf-A. P. S. C. No. 4, Index 570, effective November 15, 1943, through the remaining pertinent period:

*610

15. Plaintiff maintains that witb the exception of the period December 15, 1942, to May 23, 1943, when plaintiff’s intrastate haulage of this gasoline was subject to the specific commodity tank truck rates in Index 10290 noted above, there were no intrastate commodity, point-to-point rates on tank truck haulage of petroleum products from Mobile to the pertinent points in Alabama; and that, therefore, the intrastate rates on such transportation were the class rates in the above-mentioned tariffs, which were the equivalent of the interstate rates.
However, when there are commodity, point-to-point rates in the tariff which can be made applicable, these would take precedence over class rates. And in Alabama Motor Tariff Bureau, Agent, Motor Freight Tariff No. 1, A. P. S. C. No. 1, Index 10275, and in succeeding reissues of this tariff, to all of which plaintiff was a party, there were commodity, point-to-point rates applicable to tank truck haulage of petroleum and petroleum products from Mobile to the various points in Alabama which are pertinent here.
Index 10275 reads as follows:
petRoletjM AND petroleum products, as described in Item 1500, vol min wt 15,000 lbs.
Item 1500 contains a list of petroleum and petroleum products, among which there is the description “Gasoline, NOI.” At the bottom of the page on which Item 1500 appears, there is a notation referring to page 3-A of the tariff for abbreviations. Page 3-A explains the abbreviation “NOI” as not otherwise indexed by name in the National Motor Freight Classification No. 6 (effective March 17, 1942, to November 30, 1943) where there appears on page 223 the following:
5 PETROLEUM OR PETROLEUM PRODUCTS, INCLUDING COMPOUNDED OILS OR GREASES HAVING A PETROLEUM BASE, see Notes 1,2,3,4 and 5 below:
*611 6 Absorption oil; belt oil; benzine; compression oil; cordage oil; floor oil; gasoline, casinghead; gasoline, natural; gasoline, N. O. I.; gasolines, blended, see Note 4 below; harness oil; leather oil; miners’ oil; miners’ oil stock; naphtha; naphtha distillate; neatsfoot oil; oil, N. O. I., see Notes 2 and 3 below; pentane; putty oil; refined oil illuminating or burning; soap oil; tamers’ oil, tobacco oil; transformer oil; or wood oil; in metal cans completely jacketed, in containers in barrels or boxes, or in bulk in barrels, kits or pails_
In packages named, Vol., min. wt. 26,000 lbs. or in tank trucks, Vol., see Eule 23; estimated weight per gallon 6.6 lbs__
In Alabama Motor Tariff Bureau, Agent, Motor Freight Tariff No. 1-3, Mf-A. P. S. C. No. 4, which was a reissue of Tariff No. 1, and which was effective November 15, 1943, Item 570 contains the applicable commodity, point-to-point rates on these shipments for the same reasons that Index 10275 in the earlier tariff covers such shipments. National Motor Freight Classification No. 7, effective November 30, 1943, contains similar provisions to those in the earlier classification No. 6.
The class rates which plaintiff maintains are the applicable intrastate rates, and which are based on a rating of 37% percent of the first-class rates, are found in Alabama Motor Tariff Bureau, Agent, Motor Freight Tariff No. 1, A. P. S. C. No. 1, in a section other than Section 5 of that tariff where Index 10275 appears. Section 5 of the tariff provides:
Where rates are published in this section they take precedence over all other rates in the tariff, except where rates in other sections based on different minimum weights produce lower charges, such lower charges will apply.
FACTS RELATING TO TRANSPORTATION FROM BIRMINGPORT
16. Under date of October 26,1943, defendant entered into a contract with Southport Petroleum Company of Delaware for the transportation by water of Government-owned aviation fuel from the Texas City, Texas, area to Southport’s terminal at Port Birmingham, Alabama (also known as Birmingport), and for the transportation by the contractor *612 of such fuel in tank trucks from its terminal to certain designated airfields, should defendant request it. The contract was negotiated under the First War Powers Act and Executive Order No. 9001, in the prosecution of the war effort. The Government deemed it necessary to contract for transportation of this fuel from its source to the places where it was to be used. It was the view of those who represented the defendant that the execution of the agreement would “promote the interests of the Government and facilitate the prosecution of the war.” The contract also contained, among others, the following provisions:
Article 1 — Scope of This Contract
(1) The Contractor shall, when and as the Government, represented by the Contracting Officer, shall direct, during the period beginning August 15,1943 ,and ending June 30,1944, transport by barge not to exceed 13,230,000 gallons, in grades and quantities as directed by the Contracting Officer, of Government-owned aircraft engine fuel from the Texas City, Texas, area to Port Birmingham, Alabama, and shall load said fuel into Contractor’s river terminal located at Port Birmingham, Alabama, and shall deliver from said terminal into such transportation equipment as the Government may direct at the unit price for such barging and terminaling of $0.0225 per gallon. Contractor shall, at the direction of the Contracting Officer or the transportation officer referred to in paragraph (5) hereof, transport said fuel by truck and deliver the same to any of the following destinations at the following unit prices:

*613 (6) * * *. The Government may further direct, in its discretion, that the Contractor shall deliver the gasoline into transportation equipment from its Port Birmingham, Alabama, terminal for shipment under Government bills of lading, or into Government contracted for trucks. * * *
(7) In the event and to the extent that Contractor has, I>rior hereto, performed any of the services provided for in this Article 1, at the request of the Government, the parties agree that the services so rendered were in contemplation of and are subject to the provisions of this contract, to the same extent as if they had been performed subsequent hereto.
The contract rates, per hundredweight, at the accepted weight of 6.6 pounds per gallon, for the tank truck transportation from the terminal to the specified airfields were the equivalent of the applicable intrastate common carrier rates for this service.
17. Subsequently, this contract was amended by supplemental agreement which provided in Article 1 thereof as follows:
(a) Paragraph (1) of said Article is deleted and the following substituted in lieu thereof:
“(1) The Contractor shall, when and as the Government, represented by the Contracting Officer, shall direct, during the period beginning August 15, 1943, and ending June 30, 1944, transport by barge not to exceed 17,230,000 gallons, in grades, and quantities as directed by the Contracting Officer, of Government-owned aircraft engine fuel from the Texas City, Texas, area and/ or from the terminal of the Standard Oil Company (Incorporated in Kentucky) located at Mobile, Alabama, to Port Birmingham, Alabama, and shall load said fuel into Contractor’s river terminal located at Port Birmingham, Alabama, and shall deliver same from said terminal in the manner and at the unit prices set forth below :
(a) The Contractor shall deliver not to exceed 16,-493,500 gallons from said river terminal at Port Birmingham, Alabama, into such Government-furnished transportation equipment as the Government may direct, at the following unit prices:
(1) Fuel from the Texas City, Texas, area, at the unit price of-$0.0225 per gallon. It is understood that such unit price includes barge transportation *614 to Contractor’s river terminal at Port Birmingham, Alabama, and through-put services at said terminal.
(0) Fuel from the terminal of the Standard Oil Company (Incorporated in Kentucky) located at Mobile, Alabama, at the Unit price of $0.00625 per net ton per mile to cover barge transportation to Contractor’s river terminal located at Port Birmingham, Alabama, and in addition thereto, at the unit through-put rate of $0.19 per barrel to cover through-put services at said terminal.”
í\í ‘¡í '!* »¡í
(b) Paragraph (2) of said Article is deleted and the following substituted in lieu thereof:
“(2) The Contractor shall provide and maintain equipment and personnel sufficient for barging fuel from the Texas City, Texas, area and/or from the terminal of the Standard Oil Company (Incorporated in Kentucky) located at Mobile, Alabama, to Port Birmingham, Alabama, in the approximate monthly quantities set forth below
* * * * *
(c) * * *
Second: Wherever the words “Texas City, Texas, area” are used in the Service Contract, the same shall be deemed to refer to the following:
“Texas City, Texas, area and/or the terminal of the Standard Oil Company (Incorporated in Kentucky) located at Mobile, Alabama.”
The supplemental agreement also recited that the contractor had been unable to continue performance relating to the transportation of fuel by the contractor from the terminal to the designated, destinations by reason of the rejection by the Interstate Commerce Commission during the month of October 1943 of the contractor’s application for a permit to operate as a motor carrier, and that prior to the rejection of the application the contractor had completed delivery by trucks of 736,500 gallons of fuel from the terminal to Court-land, Alabama, in accordance with the provisions of the contract. The supplemental agreement then provided for payment to the contractor for such transportation at the originally specified contract rate.
18. During the months of September and October, 1943, when Southport Petroleum Company had temporary authority to transport aviation gasoline from its terminal at Bir- *615 mingport in tank trucks, it transported sucli fuel only to Courtland, Alabama.
Commencing on or about September 6, 1943, and continuing through June 1944, plaintiff at the request of defendant transported Government-owned, aviation gasoline from Southport Petroleum Company’s terminal at Birmingport to the following airfields, and plaintiff billed defendant and was paid at the following rates, which were the published interstate common carrier rates for such transportation:

19. In an effort to determine whether this transportation by plaintiff was interstate or intrastate in character, plaintiff’s representatives and Army representatives met with the District Supervisor for the Interstate Commerce Commission at Birmingham, Alabama, to obtain an opinion on this point. The facts given to the District Supervisor were that at the time the shipments were loaded into barges at refineries in Louisiana and Texas for movement to Port Birmingham, the destinations of the gasoline were known and intended to be Army Air Force installations in Alabama; that the only reason the gasoline was transferred from barges to storage tanks at Port Birmingham was to facilitate transfer from barge to motor carrier; and that none of the gasoline was shipped by barge to Port Birmingham for storage and further distribution. Based upon these facts, and without making an independent investigation, this Supervisor gave his opinion that all steps in the transportation of the gasoline from the refineries to installations of the Army Air Force in Alabama were interstate in character. The defendant accepted the District Supervisor’s decision and plaintiff was paid at the interstate rates.
20. Government-owned aviation gasoline was brought into Southport Petroleum Company’s terminal at Birmingport by barge from various points of origin in Texas and also from the terminal of Standard Oil Company of Kentucky at Mobile. The storage facilities at this terminal consisted of three *616 10,000-barrel tanks, and two 6,000-barrel tanks, or a total capacity of 1,764,000 gallons. Under tbe Government’s contract with Southport Petroleum Company, 1,260,000' gallons were to be transported to the terminal each month; however the actual amount delivered averaged considerably more than the capacity of the Birmingport tanks. The barges for transporting the gasoline to the terminal had capacities ranging from 8,500 to 15,000 barrels, and one or two had 20,000-barrel capacity. Plaintiff operated trucks ranging in capacity from 3,350 gallons to 4,250 gallons. The loading of plaintiff’s trucks at the terminal was a continuous operation twenty-four hours a day, seven days a week.
21. Shipments of gasoline of the same grade coming into the terminal from different points of origin, either within or without the state, were commingled, as authorized by the contract. None of the gasoline was designated or segregated for shipment to any specified point beyond the terminal; and when it was received, the terminal operator did not know to what particular destination any incoming shipment would be sent until advised by the Government. Distribution beyond the terminal was controlled by specific individual request, and each shipment moved out of the terminal on a separate bill of lading. Distribution was both by tank car and tank truck. Gasoline was shipped from the Birmingport terminal to a number of points not mentioned as destinations in the Government’s contract with Southport Petroleum Company, and which points included other terminals as well as airfields.
22. Bates applicable to the transportation by motor vehicle of petroleum and petroleum products by common carrier in interstate commerce from Birmingham were as follows:

23.The applicable intrastate rates for this transportation by plaintiff from Birmingport were as follows:

*617

FACTS RELATING TO THE TRANSPORTATION FROM BOTH MOBILE AND BIRMINGPORT
24. Plaintiff had no permanent operating authority as a common or contract carrier by motor vehicle in interstate commerce of petroleum or petroleum products in tank trucks from Mobile, Alabama, or from Birmingport, Alabama, during the period pertinent to this litigation.
Prior to 1942 plaintiff made application under the so-called “grandfather” clause of Section 209 (a) of the Interstate Commerce Act, as amended, for authority to operate as a contract carrier by motor vehicle of commodities generally, except explosives, between all points in Alabama; and plaintiff also claimed common carrier operations in interstate commerce wholly within the State of Alabama, to and from the port of Mobile.
By decision dated July 6, 1942, the Interstate Commerce Commission found that plaintiff was entitled on the basis of its operations on June 1, 1935, to a certificate to operate as a common carrier by motor vehicle in interstate commerce between certain specified points, of commodities generally, except commodities in bulls, and further that plaintiff was entitled on the basis of its operations on July 1, 1935, to a permit authorizing it to operate as a contract carrier by motor vehicle in interstate commerce, of certain specified commodities, not including petroleum or petroleum products. Also, the Commission found that the holding by plaintiff of both a certificate and a permit to the extent authorized was not consistent with the public interest, and plaintiff was required to make an election.
On plaintiff’s motion for reconsideration of the Commission’s decision of July 6,1942, plaintiff made no request for a change in the Commission’s determination that it was not a common carrier of commodities in bulk. Because of a *618 series of requests for extension of time to make the required election and divestiture, no certificate or permit had been issued to plaintiff prior to April 11, 1946. On that date the Interstate Commerce Commission entered its order denying plaintiff’s applications to operate as a contract carrier in interstate commerce, and approved the issuance of a certificate of public convenience and necessity for plaintiff to operate as a common carrier in interstate commerce by motor vehicle, in accordance with the Commission’s report and order of July 6, 1942, as modified on July 27, 1944. The certificate issued pursuant thereto did not give plaintiff authority to transport petroleum or petroleum products in tank trucks, since all commodities in bulk were specifically excluded.
Plaintiff’s temporary authorities from the Interstate Commerce Commission to transport gasoline in bulk in tank trucks, as a common carrier by motor vehicle in interstate commerce, were limited to the following:

This last order was extended from August 4,1943, to October 4,1943.
Plaintiff filed temporary tariffs with the Interstate Commerce Commission co-extensive with the dates of the temporary authorities granted, which rates were the same as the interstate rates hereinbefore set forth. ,There is no documentary evidence in the record which establishes that the Interstate Commerce Commission ever made a determination that the transportation authorized in its temporary orders was in fact interstate in character, or that it ever passed upon the temporary tariffs filed by plaintiff as being in fact properly applicable to interstate haulage. .
*619 25. Plaintiff had authority to operate as a common carrier in intrastate commerce of petroleum and petroleum products in tank trucks from Mobile and from Birmingport to the pertinent airfields. The evidence is insufficient to show that plaintiff had authority to operate as a contract carrier of those products over such routes. The Alabama Public Service Commission stated that it was not necessary to consider contract authority since common carrier authority was given plaintiff in May 1943.
26. During the period when plaintiff was transporting aviation gasoline for defendant, use of the nation’s supply of this fuel was under control of the Aviation Petroleum Products Allocation Committee. The Petroleum Administration for War advised this Committee each month of the total quantity of gasoline available, and allocations were made by the Committee to each of the users, of which the Army Air Corps was one. The users were also advised from what refineries they could draw their allocations. No allocations of gasoline were made below this level; none were made to terminals or airfields.
27. Distribution of the gasoline used by the Army Air Corps was controlled by the Air Materiel Command at Wright-Patterson Field in Ohio, which was the “supply command” for the Army Air Corps. A monthly plan of distribution for each month’s allocation of aviation fuel was set up on maps through the use of different colored pins for refineries, for terminals, and for airfields. On this map a using facility was tied to its anticipated source of supply. There were no ties between refineries and terminals. Where a terminal existed, this was considered the source of supply for the airfields in the particular areas; but changes between the using facilities and their sources of supply were made on the map daily.
28. A certain amount of gasoline from the refineries was set aside for “water-lifting;” and the entire amount which was water-lifted, except for that which went overseas by tanker, was transported to terminals by tanker or barge. Gasoline which was water-lifted normally went to terminals within a designated geographical area which comprised several states and was known as a PAW District, but it could *620 be and was moved, when the need arose, to terminals beyond the PAW District line.
29. No specified amount of gasoline to be water-lifted from a refinery was designated for, or assigned to, any particular terminal. Barge loads proceeding from the refineries could be and were diverted, en route, to a different terminal from that anticipated when the barge left the refinery, but there is no evidence in the record that any such barge, or any tanker, which left a refinery with fuel for delivery to either Mobile or Birmingport, was diverted en route.
30. Prior to the first of the month, the “supply command” would send to a terminal a list of the airfields from which that terminal was authorized to honor orders for gasoline during the month; but shipment was made only on specific request from the field. No allocation or quota was made in advance for any field., Notwithstanding such release authorizations, airfields listed did not always order gasoline during the particular month, or even for two or three months; the source of supply for a field was shifted from one terminal to another during the month.; and at the request of the Air Materiel Command the terminal operator shipped to fields other than those listed on the release authorizations. The terminals at Mobile and at Birmingport were operated, during the period here pertinent, in all respects on this basis.
31. Terminals were not used solely as a source of supply for airfields. At the request of the Air Materiel Command, gasoline was shipped from one terminal to another both within and without the state. Government aviation gasoline was shipped from Standard Oil Company’s terminal in Mobile to Southport Petroleum Company’s terminal in Birmingport, and this latter terminal shipped gasoline from its supply to a terminal in Georgia.' Services performed by the terminals in the handling and storage of Government aviation fuel were known as “through-put” which covered the receipt and storage of the gasoline, and the issuance thereof into outgoing transportation.
32. While it cannot be said that at the time a particular shipment of Government aviation gasoline was “water-lifted” from refineries in Texas and Louisiana, the ultimate destination of that particular gasoline was known and estab *621 lished as a particular airfield, .it appears clearly established that the primary and overriding “intent” of defendant was to have it delivered to and used by its various airfields.
33. The service which plaintiff was required to render defendant was different in many aspects from what would ordinarily have been required in the case of the non-government shipper. For example, services which the plaintiff was, or could be, required to render the Government, included the following requirements and contractual rights:
1. The Government could inspect the carrier’s facilities and operations at all times.
2. The Government had access to all of the carrier’s accounting records.
3. The carrier was required to get Government approval of its method of accounting, and the carrier was required to set up a separate system of accounts for work under the contract and to preserve these records for at least three years after completion.
4. The carrier was contractually bound not to discriminate against its employees because of race, creed, etc.
5. The carrier assumed responsibility for safeguarding secret and confidential matters under the contract, and could not mention the existence of the contract to the Securities and Exchange Commission without Government consent.
6. The Government, for its own convenience, could terminate the contract at any time.
7. Disputes over questions of fact had to be submitted to the contracting officer (an agent of the shipper) for determination.
8. The carrier was required to report to the Government any actual or potential labor dispute which might delay or threaten to delay, performance of the contract.
9. At any time, the Government could require additional protective equipment and personnel (whether or not required by the Interstate Commerce Commission or other regulatory agency).
10. The carrier could be required to renegotiate its profits and, in that connection, supply the Government *622 with such financial data as it should require and permit whatever audits and inspections of the carrier’s records as the Government might request.
34. At present the Government uses and operates terminals as storage facilities in connection with its distribution of military petroleum supplies. Reserves are maintained, and the normal operation is a maximum of four through-puts per year. This operation today is substantially the same as it was during World War II, except that during 1943 and 1944 there existed a national emergency and the rate of turnover was much faster because of the necessity for maintaining a constant flow of the fuel, making it more difficult during the war years to keep the desired cushion of reserve supplies on hand at the various airfields.
CONCLUSION 0E LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c).
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on October 14, 1960, that judgment for plaintiff be entered for $43,946.37.