Durfee, Judge,
delivered the opinion of the court:
The only issues to be decided in this case are those raised by the defendant’s counterclaim, since it has been agreed that plaintiff is entitled to judgment on its claim for amounts due under a contract to supply natural gas to a certain Government ordnance plant. The counterclaim is based on alleged rate discrimination against the defendant through violation of a common provision in several gas supply contracts which represented that the rates set forth were not in excess of the lowest rates then available to any other customer under like conditions of service.
The plaintiff is an integrated gas company, which means that it produces, processes, gathers, transports, and sells natural gas at retail. During the years covered by defendant’s counterclaim, 1942 to 1950, the largest percentage of plaintiff’s sales were made to customers in the State of Arkansas. The customers included residential, commercial, and industrial users. The industrial customers ranged widely in the matters of size and required service from small dry cleaners and laundries to large power companies and aluminum processers. The five Government chemical and ordnance plants, located in Arkansas, Louisiana, and Texas, and supplied by the plaintiff under the agreements now before us, fell between the extremes. Plaintiff gas company, as a public utility, is subject to regulation by the appropriate state agency in the tri-state area which it serves. Although the Arkansas Public Service Commission had the authority during this period to regulate rates to customers outside city distribution plants, like the defendant, it did not do so. The principal demand on plaintiff’s supply system was centered *656 south of Little Kock between Hot Springs and Pine Bluff, Arkansas. The principal sources of plaintiff’s gas were wells in east Texas and northern Louisiana. During the early part of the contract period plaintiff utilized gas from certain fields in south central Arkansas to supply its customers.
Two of the Government installations supplied were located in Arkansas and were served under what was known as the 3-B industrial rate, the same as that available to any large industrial customer in Arkansas. This rate was higher, however, than the rate offered to a number of oil refineries in that state. Two of the remaining Government plants were located near Texarkana, Texas and one in Louisiana. In general, the rates for industrial customers in Louisiana were less than those in effect in Arkansas because of proximity to the source of supply. Both interruptible and noninterruptible gas service was contemplated by the contracts between plaintiff and defendant; the counterclaim, however, is concerned only with the rates and conditions of service under which interruptible gas was supplied to the Government plants and other industrial customers. “In-terruptible” service means that the company has the right to curtail gas service to such an industrial user during periods of high demand, usually the winter heating season, when necessary in order to provide service to its “firm” or “non-interruptible” customers. During an interval of less than one year within this period, the plaintiff also furnished in-terruptible service to the Lone Star Steel Company which, like the defendant’s plants and the oil refineries, was a mainline customer off the gas company’s high pressure transmission lines at that time. However, effective in July 1945, a special contract was negotiated between the steel company and the gas company which resulted in firm gas service at rates lower than those offered certain of the Government installations for interruptible service.
The defendant contends that it did not get the benefit of the lowest rate available to any other customer under like conditions of service, particularly emphasizing the lower rates offered to the several Arkansas oil refineries and the Lone Star Steel Company in Texas. Since these rates are admitted to have been lower than those offered the Govern *657 ment, the issues are reduced to a single question, namely, whether like conditions prevailed as to the services performed in supplying the Government installations and in supplying the refineries and the steel company. Because of the unusual circumstances surrounding the plaintiff’s contract with the Lone Star Steel Company, the conditions of service for that customer will be considered separately from these of the refineries and the Government installations.
Neither party has excepted to the characteristics or conditions of service which the trial commissioner has found to affect the rates charged to plaintiff’s customers. These characteristics are: the level or consistency of use throughout the year; the distance the gas is transported; the continuity of service; the state in which the service is rendered; and the type of gas required. The defendant argues that some of these conditions were comparable as they apply to the defendant’s plants and to the oil refineries and that others of the conditions as to which there was a difference are not of significance in this case.
The trial commissioner has found that it is impractical for the plaintiff to determine costs of serving any particular customer and that, consequently, classes of customers are generally set forth in separate schedules. The grouping of oil refineries together in one class because of the similar service requirements which may be significantly different from other industrial concerns is a reasonable one. Within the states it served, like any public utility operating in any state, the plaintiff was required not to discriminate as between customers having like conditions of service. And each of the contracts entered into with the defendant provided for higher or lower rate schedules if the state regulatory commission authorized it or if a different, applicable rate schedule would be more advantageous to the defendant. Moreover, the rates in the several contracts conform to the industrial rates in effect in the state where the particular Government installation was located.
We cannot agree with the position of the defendant that unless each customer in any class (in this case the oil refineries) differs in each of the conditions of service from any of the conditions of the various Government plants the Gov *658 ernment must get the benefit of the lower rate offered the whole class. In other words, because of the plaintiff’s obligation not to discriminate, which can only be practicably accomplished by utilizing class rates, the conditions of service of the refinery class as a whole may properly be compared with those of the defendant’s plants in order to determine whether like conditions prevailed as between the two.
The defendant quite correctly points out that some of the conditions of the service provided the Government plants were comparable to the conditions at the refineries and the steel company. Since the counterclaim relates only to the rates involved in interruptible service, the continuity factor was the same as to all customers. Also, the type of gas supplied, with the exception of that supplied to the steel company after July 1, 1945, which situation will be discussed below, was the same to all customers.
However, the other characteristics were not the same for all customers and the differences are significant to a greater or lesser degree in determining whether like conditions of service obtained. For example, during almost all of the period in question, the refineries located in Arkansas were in close proximity to oil fields which also produced considerable quantities of gas. The refineries were located closer to the source of supply than any of the Government plants, with the exception of the one in Louisiana, and closer than other industrial users. The factor of proximity to source of supply is reflected in the low rates offered the Louisiana ordnance plant which would have paid less for its gas than did the refineries had it consumed the maximum quantity of gas which the plaintiff was obliged to deliver under the contract. The approved gas rates in Louisiana have historically been lower than the rates for similar customers in Arkansas because of this nearness to the source of supply.
While it may be true that the United States is free to contract for rates for intrastate transportation other than those set by state regulatory bodies,[1] we are not certain that *659 the same is true in regard to the intrastate and interstate supply of a commodity ordinarily subject to the regulation of a state public utilities commission, even where that agency chooses not to exercise its regulatory powers. In any event, each of the contracts between the parties either took into consideration that rates were offered on a class basis uniformly throughout that particular state or contemplated that the rates might be changed by action of the regulatory agency of that state, or both. Clearly, the contracts were entered into in the light of the regulatory structures existing in each of the three states. The contract rates conform to the rates in effect in the state wherein the particular Government facility is located and they differ as between the facilities in the several states. The state in which the service was contracted for and performed is, therefore, a factor which must be considered in determining whether like conditions existed as to all customers.
As a class, the volume of gas consumed by the oil refineries was more than three times that of the consumption of the Government-owned facilities between 1942 and 1950. One oil refinery alone used more than the combined volume of all of the defendant’s plants. And the average consumption of the refineries was greater than the average consumption of the Government plants. Since the plaintiff necessarily must sustain certain costs of production and supply which do not vary regardless of the volume supplied to a given customer, it is obvious that the greater the volume supplied, the lower the fixed expenses on a per unit basis. It is correct, as pointed out by the defendant, that the two largest consumers among the Government plants used more gas than the smallest consumer among the refineries. But, as we have indicated above, we think it is proper to consider the characteristics or conditions of the refineries and the plants as classes. The overall figures relative to the volume of consumption of gas reveal that a like condition did not exist between the plants and the refineries.
Similarly, there was a difference in the consistency of use between the refineries and the Government plants. With the exception of the most consistent user among the defendant’s facilities as compared to the least consistent refinery, the *660 “load factors” of the refineries were higher. The load factor is a significant element contributing to the expenses incurred by the plaintiff in supplying its gas. Load factor is the relationship of the amount of gas used during the lowest off-peak month to that used during the highest month. In processing crude oil, the refineries operated 21 hours a day at a high level of consumption. The load factor for all the Arkansas refineries between 1942 and 1950 was 81 percent while that for all the Government plants was 47 percent. Since the plaintiff has to be prepared to supply its customers a certain maximum level of consumption, the degree to which the customers make use of the facilities maintained by the plaintiff has a bearing on the plaintiff’s cost of supplying the gas.
The circumstances surrounding the plaintiff’s services to the Lone Star Steel Company require special mention. Under a contract dated October 2, 1944, the plaintiff began supplying the steel company with interruptible gas from its main line. The following year a Texas pipeline company proposed to supply Lone Star Steel with gas at rates lower than those charged by the plaintiff by building a new pipeline to nearby gas reserves then owned by the Texas company. The plaintiff was informed that it might acquire the gas in the field near the steel company but only on condition that it assume the contract obligations of the Texas company to supply gas to the steel company at the lower rates. Consequently, the pipeline company sold the gas reserves to the plaintiff; the plaintiff contracted to supply Lone Star Steel at the lower rates undertaken by the pipeline company; and Lone Star Steel released the pipeline company from its obligation to supply gas at the rate agreed upon. These provisions were embodied in a written agreement effective July 1, 1945. The evidence shows that if the plaintiff had not entered into the agreement described above it would have lost both the opportunity to acquire the Texas gas reserves and the patronage of Lone Star Steel.
After the new contract with Lone Star Steel became effective the plaintiff was required to provide gas service only from the reserves located about 18 miles from the steel company from a direct line not requiring' high pressure. The gas so supplied was not required to be processed to remove *661 excessive water and sulphur content as was the gas transmitted through plaintiff’s main line. After the plaintiff’s contract to supply Lone Star Steel ended, it was able to use these reserves to supply its main line customers after processing. Even if we were to conclude that the arrangements between the plaintiff and Lone Star Steel were concluded merely for reasons ordinarily present in a simple supplier-customer relationship, we would have to conclude that there were significant differences in some of the conditions of service to preclude comparison of that service to the service offered the defendant.
For the foregoing reasons, we conclude that those industrial concerns which received lower rates than the defendant’s plants operated under dissimilar conditions of service and the defendant is not entitled to the benefit of the lower rates. The defendant’s counterclaim will be dismissed. Judgment will be entered for the plaintiff in the amount of $33,140.14.
It is so ordered.
LaRAmokg, Judge; Madden, Judge; Whitaker, Judge, and Jones, Chief Judge, concur.
FINDINGS OE FACT
The court, having considered the evidence, the report of Trial Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a natural gas utility company engaged in the business of producing, purchasing, transporting, and selling natural gas to residential, commercial, and industrial consumers in the States of Arkansas, Louisiana, and Texas.
2. During the period from July 1, 1951, through December 25,1952, plaintiff supplied to defendant at the Shumaker Naval Ordnance Depot near Camden, Arkansas, 594,900,000 cubic feet of gas under interruptible service, and the defendant paid therefor the sum of $53,759.51.
3. In the State of Arkansas, the Arkansas Public Commission had jurisdiction by the laws of that state to regulate the rates which plaintiff could charge to or contract for with its customers in the State of Arkansas. Under the rates put into effect by the orders of the Commission for the period *662 from July 1, 1951 to December 26, 1952, the price for the interruptible gas delivered to the Shumaker Naval Ordnance Depot was $90,581.89. Plaintiff demanded that the defendant pay the difference between the amount due under the rates prescribed by the Commission and the amount actually paid, but payment was refused by the Government.
4. It is undisputed that the net amount now due plaintiff for gas supplied to the Shumaker Naval Ordnance Depot during the period stated above is the sum of $33,140.14, which takes into account a refund to which the Government is entitled. This is the claim covered by plaintiff’s petition.
dependant’s counterclaim:
5. The only issues to be resolved in this action are those raised by defendant’s amended counterclaim in which it asserts:
(a) that plaintiff and defendant entered into written contracts by which plaintiff agreed to supply natural gas to Government installations in the States of Arkansas, Louisiana, and Texas;
(b) that each of the contracts contained a written representation by plaintiff that the rates set forth therein were not in excess of the lowest rates available to any other customer under like conditions of service;
(c) that from 1942 to 1950, when plaintiff was furnishing gas to the Government installations under such contracts, plaintiff supplied also gas to other customers under like or similar conditions of service but at lower rates than those provided for in the contracts between plaintiff and defendant, and
(d) that the difference between the amount defendant paid plaintiff for the gas furnished to the defendant’s installations from 1942 to 1950 and the amount which defendant should have been charged at the lower rates paid by other customers during the same period is the sum of $323,283, which defendant seeks to recover herein with interest thereon.
6. Plaintiff is an integrated gas company which produces, processes, gathers, transports, and sells natural gas at retail. Prom 1942 to 1950, the period covered by defendant’s counterclaim, about 85 percent of plaintiff’s sales were made to *663 customers in the State of Arkansas, the balance being divided about equally between Louisiana and Tesas. The principal demand on plaintiff’s system is centered in the area below Little Rock, Arkansas, between the cities of Hot Springs and Pine Bluff. Little Rock and Shreveport are the two largest cities served for distribution purposes but other sizable towns served are Texarkana, El Dorado, Hot Springs, and Pine Bluff. In the period mentioned above, plaintiff’s principal supply of gas was obtained from producing wells in east Texas and north Louisiana. However, during the early part of that period, a considerable amount of gas was secured by plaintiff from gasfields in south central Arkansas, near Columbia Point, Magnolia, and El Dorado. These latter fields became depleted shortly prior to 1950.
As shown by the map, which is plaintiff’s exhibit 11, plaintiff’s system is constructed so that the gas from the producing wells of east Texas and north Louisiana moves into plaintiff’s 20-inch pipeline extending from Shreveport, Louisiana, to Monroe, Louisiana. Plaintiff’s system is roughly in the form of a triangle in which the base is the 20-inch pipeline; from it the supply of gas moves northwesterly from Monroe and northeasterly from Shreveport into the main transmission lines to serve the principal market centered in Arkansas. The flow of gas between Monroe and Shreveport runs eastwardly or westwardly, depending upon the demands upon the system and the amount of gas available at either end. Plaintiff’s gas from the fields in south central Arkansas moved in a northeasterly direction into the main distribution system and toward Little Rock, Arkansas.
7. As previously stated, plaintiff’s customers included residential users, commercial customers such as department stores, hospitals, prisons, army camps and the like, and a third category of industrial customers. In the industrial group, there were great variations in respect to the size of the operation, the requirements for service of gas, the volume of gas purchased, and the conditions under which the gas was delivered. On the basis of the volume of gas used, the smallest of the industrial customers were dry cleaners and laundries, and the largest were electric generating plants and processors of aluminum. The Govern *664 ment’s chemical and ordnance plants fell between these two extremes.
8. In the area served by plaintiff, the maximum requirements for its gas occur during the heating season which extends from November 1 to May 1 of each year. The demand for gas for space heating in homes, stores, and buildings reaches its peak in the months of December, January, and February. Because of the requirements for large quantities of gas during the peak of the heating season, it is necessary for plaintiff to interrupt or curtail the quantity of gas supplied to industrial consumers during the peak period so that the residential and commercial customers will have sufficient fuel for their needs. Consequently, most of the contracts plaintiff entered into with its industrial customers contained a provision giving the company the right to interrupt, curtail, or shut off the supply of gas when necessary. These interruptions generally covered only two or three hours per day during the coldest days of the year. On the other hand, the gas supplied by plaintiff to residential and commercial customers was designated as “non-interruptible” gas, because plaintiff could not curtail or shut off the supply of gas to these customers. The conditions under which interruptible gas was furnished to the industrial customers were reflected in the rate schedules of these consumers. Some of the contracts between plaintiff and the Government installations named in defendant’s counterclaim provided for the delivery of both interruptible and non-interruptible gas, but the counterclaim is concerned only with the rates and conditions of service under which interruptible gas was supplied to Government plants and other large industrial customers.
9. Since it is a public utility, the rates at which plaintiff sold gas to its customers were subject to regulation by the Arkansas Public Service Commission, the Louisiana Public Service Commission, and the Texas Railroad Commission, within the States of Arkansas, Louisiana, and Texas, respectively.
10. Between 1942 and 1950, the rates chargeable by plaintiff for gas sold in the State or Arkansas were regulated in accordance with General Order 13, issued April 13, 1935, *665 by the Arkansas Public Service Commission. Under this order, plaintiff was required to file with and secure the Commission’s approval of the rates which plaintiff charged for gas supplied to industrial customers from distribution plants located within the corporate limits of any city in Arkansas. Although it had the authority to do so, the Commission did not require plaintiff to file with or obtain Commission approval of rate schedules under which plaintiff served main-line industrial customers outside city distribution plants. In the period pertinent to this action, therefore, the plaintiff was authorized to and did negotiate the rates to be paid for its gas directly with its large main-line industrial consumers, including the Government installations in Arkansas and the Arkansas oil refineries, which are referred to in defendant’s cotmterclaim.
11. On August 14, 1942, plaintiff and defendant entered into a negotiated written contract by which the plaintiff agreed to supply natural gas to the Pine Bluff Arsenal in Pine Bluff, Arkansas. The contract included one schedule of rates for non-interruptible gas for space heating and other non-industrial uses and another schedule of rates to be charged for interruptible gas to be used in boiler plants and similar industrial purposes. The contract read in pertinent part as follows:
Whereas, the Contractor is a public utility engaged in the business of supplying natural gas service to private and public consumers in the States of Arkansas, Louisiana and Texas; and
WheReas, the Government and the Contractor are entering into this contract for the supplying by the Contractor to the Government of natural gas service for the operation of boilers, gas engine power generation, laboratory purposes and for space heating, cooking, water heating and miscellaneous uses at Pine Bluff Arsenal, near Pine Bluff, Arkansas, hereinafter called the Project; and
Whereas, In order that the Contractor may supply natural gas service in accordance with the terms of this contract and within the time specified, it is necessary for the Contractor to provide the facilities described and enumerated in Appendix “A” attached hereto, and generally referred to hereinafter as “Contractor’s New Facilities”; and
*666 Whereas, Due to the present uncertainty as to the amount of gas service which Government will use, and as to the length of time the project will be operated, the Government is willing to compensate Contractor in the form of a “connection charge” for the cost of the facilities required to furnish services;
Now, Therefore, in consideration of the premises and of the mutual agreements herein contained, to be performed by the parties hereto respectively, it is agreed as follows:
* sf: * . * *
Article II. — Payment for Cost of Facilities
1. In consideration of the investment to be made by the Contractor and the uncertain duration of the operation of Pine Bluff Arsenal, the Government agrees to pay the Contractor, as a connection charge, the actual cost, as hereinafter defined, of the facilities to be provided by the Contractor under this contract within thirty (30) days after receipt of satisfactory evidence of completion of the facilities and the cost thereof; except that the connection charge shall not exceed $167,904.00. The net connection charge to be paid by the Government shall be the actual cost of the facilities to be provided (Such actual cost to be on the bases shown in Appendix “A”, sheets number one to five inclusive) but m no event more than $167,904.00. The Government is to receive a refund of the amount so paid as hereinafter provided.
* * * * * *
Article IV. — Refund Agreement
1. In consideration of the fact that the Contractor is to be reimbursed for the actual costs, as hereinbefore provided, of the facilities to be provided hereunder, and the further consideration that title to said facilities is to be and remain in the Contractor, it agrees to allow the Government on each monthly bill for gas service supplied as hereinafter provided for, a credit of ten per cent (10%) of the net amount of such bills as rendered, said credits to be made monthly and adjusted at the end of each contract year for the annual volume discount incorporated in the interruptible gas rate. The credits shall continue until such time as the accumulated credits equal the amount of the connection charge, unless this contract shall have been previously terminated by the Government, or by the Contractor in accordance with *667 the provisions of Article XX hereof; except that if a new contract for the supply of gas service shall be entered into between the parties hereto within a period of fifteen (15) months from the date of such termination, the deductions shall resume and continue as above provided. Such ten (10%) per cent credit shall become effective with the billing period ending on the twenty-sixth (26th) day of the month following the date of completion of work of reconditioning such lines.
2. Anything in this contract to the contrary notwithstanding, no refund shall be made the Government or credit allowed on Government bills, after fifteen (15) years from the date of this contract.
Article V. — Minimum Charges
1. In the event of a partial or total shut down or abandonment of the project, and as a result thereof, gas consumption is curtailed to less than twenty-five per cent (25%) of the average consumption for the ninety (90) day period immediately preceding such curtailment, then the Government shall have the option to give the Contractor ninety (90) days notice after which time the minimum charge indicated in the rate schedule shall not apply, and the minimum to be charged shall be in accordance with the rate for the class of service required.
2. The minimum charge provided in the rate schedule shall apply only to the period beginning with the date that interruptible gas is first delivered hereunder.
*****
Article YII. — Term of Contract
1. This contract shall take effect as of the date of execution thereof and continued until further notice. Notice of intention to terminate this contract shall be at the option of the United States and shall be given in writing by the Contracting Officer to the Contractor not less than ninety (90) days in advance of the effective date of termination.
2. This agreement may be terminated by the Contractor in accordance with the provisions of Article XX hereof.
# # # #
Article X. — Services To Be Eendered
Government understands that Contractor’s gas pipeline and distribution system in Arkansas, North Loui *668 siana, and East Texas has been subjected to a large increase in demand as a result of war and other defense plants located along its lines, and defense workers and their families being concentrated in the cities and towns adjacent to these plants. As a consideration for this service Government agrees to install adequate fuel oil standby equipment and fuel oil storage, or its equivalent, in the boiler plants whose peak day requirements are estimated by Government at 6,781,000 cubic feet. Contractor reserves the right, on one hours notice from Contractor’s Gas Dispatcher, to limit the gas supply hereunder to the non-interruptible gas requirements of the project, when such action is found necessary during periods of cold weather in order for Contractor to furnish gas for the domestic and other human needs customers.
% * ^ * if:
Article XIX. — Change of Schedule
The Contractor hereby agrees that if, after furnishing natural gas service for any ninety (90) day period during the life of this contract, it would have been more advantageous to the Government to have taken service mider any other of the Contractor’s standard rate schedules in effect during any such period for like conditions of service to the class of service furnished hereunder, the rate shall be changed to conform to the schedule and an adjustment of the charges for the last of such periods shall be made, based on such schedule.
Article XX. — Change of Nates
The state commission not having jurisdiction over the rates stipulated in this contract, the rates quoted in Article XXIV are not subject to change during the period ending June 30, 1944. After the period ending June 30, 1944, the Contractor reserves the right to change the rate, if such change is necessary, due to increased operating expenses, or other causes (for Taxes see Article XXVI) which materially increase the cost of rendering the gas service hereunder, and over which the Contractor has no control; Contractor will give the Contracting Officer written notice of intention to change the rate not later than ninety (90) days before the termination of the current rate, and if the rate is not agreed upon within the ninety (90) day period, the Contractor reserves the right to partially or wholly discontinue service under this contract.
*669 Article XXII. — Payments
1. For and in consideration of the faithful performance of the stipulations of this contract, the Contractor shall be paid by the designated disbursing officer for natural gas herein contracted for, at the rates and under the terms and conditions hereinafter set forth; and the Contractor hereby declares that said rates are not in excess of the lowest rates now available to any prospective customer under like conditions of service.
*1»
Article XXIV. — Rates
1. The schedule of rates which shall be charged for non-interruptible gas consumed by Pine Bluff Arsenal for space heating, cooking, water heating, laboratory, standby gas engine power generation, and miscellaneous uses, shall be as follows:
Net Monthly Rate:
First 100 M.C.F. at $0.55 per M.O.F.
Next 500 M.O.F. at .25 per M.O.F.
Next 500 M.O.F. at .23 per M.O.F.
Next 1,000 M.O.F. at .21 per M.O.F.
Next 3,000 M.O.F. at .15 per M.O.F.
Next 3,000 M.O.F. at .14 per M.O.F.
all over 8,100 M.O.F. at .13 per M.O.F.
Minimum Charge: There shall be no minimum charge, but Government agrees to purchase its entire requirements of non-interruptible natural gas from Contractor.
2. The schedule of rates which shall be charged for interruptible gas consumed by Pine Bluff Arsenal in boiler plants and other industrial purposes shall be as follows:
Net Monthly Rate:
First 5,000 M.O.F. at $0.16 per M.O.F.
Next 5,000 M.O.F. at .13 per M.O.F.
Next 10,000 M.O.F. at .10 per M.O.F.
All over 20,000 M.O.F. at .08 per M.O.F.
Minimum Charge. A minimum of $600.00 per month net shall he collected.
Annual Volume Discount: If Government uses, in any twelve months contract period, a total volume of 100,000 M.O.F. or more, Contractor will return to Government, at the end of such period, by reason of the use of such annual volume, an amount of money computed at the following rates:
For consumption from and including 100,000 M.O.F. up to 150,000 M.O.F. per annum, one-half cent ($0,005) per M.O.F.; for consumption from 150,000 M.O.F. to 200,000 M.O.F., one cent ($0.01) per M.O.F.; for consumption from 200,000 M.O.F. to 250,000 M.O.F., one and one-half cents ($0,015) per M.O.F.; *670 for consumption from 250,000 M.C.IP. to 300,000 M.C.F., two cents ($0.02) per M.C.F., and for consumption of 300,000 M.C.F. or more, two and one-half cents ($0,025) per M.O.F. The annual rate under this schedule, for any contract year shall not be less than an average of 8.75 cents per M.O.F.
12. On April 27,1945, plaintiff and defendant entered into a negotiated written contract by which, plaintiff agreed to supply non-interruptible gas for space heating at defendant’s Shumaker Naval Ordnance Plant in Camden, Arkansas, under a specified schedule of rates and also agreed to supply interruptible gas at the same ordnance plant for industrial purposes at lower rates. The contract is in evidence as defendant’s exhibit 8 and contains the following pertinent provisions:
# * * * *
Article III — Payment eor Cost op Facilities — -In consideration of the investment to be made by the Company and the uncertain duration of the operation of Shumaker Naval Ordnance Plant, the Government agrees to pay the Company, as a connection charge, the actual cost (less agreed net salvage value) as hereinafter defined, of the facilities to be provided by the Company under this contract, within thirty (30) days after receipt of satisfactory evidence of completion of the facilities and the cost thereof; except that the connection charge shall not exceed $108,715.20. The connection charge to be paid by Government shall be the actual cost (less agreed net salvage value) of the facilities to be provided (Such actual cost to be on the basis shown in Appendix “A”, sheets number 1 to 8, inc. and such agreed net salvage value to be as specified in said Appendix “A”) but in no event more than $108,715.20.
* * $ * *
Article V — Kefund Agreement. — 1. In consideration of the fact that the Company is to be reimbursed for the actual cost, less agreed net salvage value, as hereinbefore provided, of the facilities to be provided hereunder, and the further consideration that title to said facilities is to be and remain in the Company, it agrees to allow the Government on each monthly bill for gas service supplied as hereinafter provided for, a credit of ten per cent (10%) of the net amount of such bills as rendered, said credits to be made monthly and adjusted at the end of each contract year for the annual volume discount incorporated in the interruptible gas rate. The credits shall continue until such time as the accumulated credits *671 equal the amount of the connection charge, unless this contract shall have been previously terminated by the Government. Except as otherwise provided in paragraph 2 of this Article V, in the event the Company shall terminate this contract prior to the refunding in full of the connection charge, the Company shall thereupon pay the unrefunded balance of the connection charge to the Government. Such ten (10%) per cent credit shall become effective with the billing period ending at 8:00 A.M. on the twenty-sixth (26th) day of the month following the date of completion of Company’s New Facilities.
2. Anything in this contract to the contrary notwithstanding, no refund shall be made the Government or credit allowed on Government bills, after ten (10) years from the date of completion of Company’s new facilities.
* * * *
Article VIII — Services To Be Rendered * * *
3. Government understands that Company’s gas pipeline and distribution system in Arkansas, North Louisiana, and East Texas has been subjected to a large increase in demand as a result of war and other defense plants located along its lines, and defense workers and their families being concentrated in the cities and towns adj acent to these plants. Therefore Government shall, as far as is practicable, install adequate fuel oil standby equipment and fuel oil storage, or its equivalent, in the boiler plants served by Company hereunder on the in-terruptible gas rate. The peak day requirements of Government’s plants hereunder for interruptible gas are estimated at six million (6,000,000) cubic feet per day, and Government agrees to maintain a minimum of ten (10) days fuel supply. Company reserves the right, on one hours’ notice from Company’s Gas Dispatcher, to limit the gas supply hereunder to the non-interruptible gas requirements of the project, when such action is found necessary during periods of cold weather in order for Company to furnish gas for the domestic and other human needs customers.
* $ $ $ ‡
Article XV — Change op Rates — If during the life of this contract the State Commission having jurisdiction receives for file in authorized manner rates that are higher or rates that are lower than those stipulated herein for like conditions of service, the Company hereby agrees to continue to furnish natural gas service as stip *672 ulated in this contract and the Government hereby agrees to pay for such natural gas service at the higher or lower rates from and after the date when such rates are made effective.
Asticle XVI — Payments—1. For and m consideration of the faithful performance of the stipulations of this contract, the Company shall be paid by the designated disbursing officer for natural gas herein contracted for, at the rates and under the terms and conditions herein set forth; and the Company hereby declares that said rates are not in excess of the lowest rates now available to any prospective customer under like conditions of service.
Article XVIII — Rates—The schedule of rates which shall be charged for noninterruptible gas consumed by the Shumaker Naval Ordnance Plant for space heating, cooking, water heating, laboratory purposes, and miscellaneous uses, shall be as follows:
Net Monthly Rate:
First 100 M.C.F.
Next 500 M.C.F. at .25 per M.C.F.
Next 500 M.C.F. at . 23 per M.C.F.
Next 1, 000 M.O.F. at . 21 per M.C.F.
Next 3, 000 M.C.F. at . 15 per M.O.F.
Next 3, 000 M.C.F. at . 14 per M.C.F.
All over 8,100 M.C.F. at . 13 per M.C.F.
Minimum Charge: There shall be no minimum charge, but Government agrees to purchase its entire requirements of non-interruptible natural gas from Company.
2. The schedule of rates which shall be charged for interruptible gas consumed by Shumaker Naval Ordnance Plant in boiler plants and other industrial purposes shall be as follows:
Net Monthly Rate:
First 5,000 M.C.F. at $0.16 per M.C.F.
Next 5, 000 M.C.F. at . 13 per M.C.F.
Next 10, 000 M.O.F. at . 10 per M.C.F.
All over 20,000 M.C.F. at . 08 per M.C.F.
Minimum Charge: Six hundred ($600.00) dollars per month net. If, during any month, the average rate produced by the application of the net monthly rate scheduled is less than 8.75 cents per M.C.F., the bill for that month shall be computed at 8.75 cents per M.C.F. for all gas consumed.
Annual Volume Discount: If government uses, in any twelve (12) months contract period, a total volume of 100,000 M.C.F. or more, Company will return to Government, at the end of such period, by reason of the use of such annual volume, an amount of money computed at the following rates: For consumption from and including 100,000 M.C.F. up to 150,000 M.C.F. per annum, one-half cent ($0,005) per M.C.F.; for con *673 sumption from 150,000 M.O.F. to 200,000 M.O.F., one cent ($0.01) per M.O.F.; for consumption from 200,000 M.O.F. to 250,000 M.O.F., one and one-half cents ($0,015) per M.O.F.; for consumption from 250,000 M.O.F. to 300,000 M.O.F., two cent ($0.02) per M.O.F.; and for consumption of 300,000 M.O.F. or more, two and one-half cents ($0,025) per M.O.F. The annual rate under the schedule, for any contract year, shall not be less than an average of 8.75 cents per M.O.F. * * *
13. During the period between 1942 and 1950, plaintiff offered to its industrial customers in Arkansas a choice of the rates provided for in three standard rate schedules, which were filed with and approved by the Arkansas Public Service Commission. These schedules were designated as numbers 3, 3-A, and 3-B and covered the sale of gas to industrial customers from distribution systems in incorporated towns. The 3-B rate contemplated the use of relatively large volumes of gas and was the lowest of the three rates for the amount of gas consumed, but it also required the payment of a higher minimum monthly charge than the rates in schedules 3 and 3-A.
Although it was not required to do so by the Commission, plaintiff followed the practice of contracting to supply gas to many of its main-line industrial customers (located beyond city distribution systems) in Arkansas at the same rates which the Commission prescribed for industrial consumers served from city distribution systems. Plaintiff’s contracts with the Arkansas oil refineries were an exception to the practice.
14. The rates stated in the 3-B rate schedule published by plaintiff and approved by the Arkansas Public Service Commission for large industrial consumers served from distribution plants in incorporated cities in Arkansas were the rates provided for interruptible gas supplied by plaintiff to defendant at the Pine Bluff Arsenal and at the Shumaker Naval Ordnance Plant under the contracts involved here.
Other large industrial customers of plaintiff in Arkansas, whose contracts incorporated the 3-B industrial rate, including some whose plants were served from city distribution systems and some from the main line, were the Acme Brick Company, National Lead Company, Consolidated Chemical Industries, American Cyanide and Chemical Company, Dul-len Bauxite Company, Alcoa Mining Company, Minnesota Mining and Manufacturing Company, and Crouch Mining *674 Company. Some 20 to 30 main-line customers were served by plaintiff under the 3-B rate schedule in the State of Arkansas in the period pertinent to this action.
15. In addition to the above-described large industrial customers in Arkansas, plaintiff also supplied gas under in-terruptible service only to a group of Arkansas oil refineries pursuant to contracts entered into between plaintiff and the refineries on a standard form entitled “Contracts for Sale of Industrial Gas.” This group included Berry Asphalt Company, which had two refineries, Henry H. Cross Company, Inc., MacMillan Petroleum Corporation, Pan American Southern Corporation, Lion Oil Befining Company, and J. B. Querbes Oil Company. Each of these refineries was located within the limits of an oil and gas producing field or fields in southern and south central Arkansas and was served under an annual contract entered into with plaintiff at standard refinery rates, which were lower than those provided for in the contracts covering interruptible gas supplied to the Pine Bluff Arsenal and the Shumaker Naval Ordnance Plant. Plaintiff’s contract with the Berry Asphalt Company, which is a typical example of the contracts entered into with the other refineries named in the period material to the counterclaim, contained the following pertinent provisions:
Gas Kate:
First 2, 000, 000 cu. ft. per month. — $0.10 per M.O.F.
Next 3, 000, 000 cu. ft. per month— .0950 per M.O.F.
Next 5, 000, 000 cu. ft. per month— .09 per M.O.F.
All over 10, 000,000 cu. ft. per month— .08 per M.C.F.
Minimum Charge: During each month of this contract, Buyer agrees to take or pay for a net minimum of $500.00 worth of gas.
Terms of Payment: The net monthly bill is payable on or before the twentieth (20th) day of the month succeeding that month in which service is rendered. If the bill is not paid by such date, an additional amount of ten per cent (10%) shall be added, up to a maximum of $50.00 per monthly bill.
Special Provision: If, as a result of Federal, State or local legislation, any additional excise taxes on the production, transportation, or sale of natural gas are levied subsequent to April 5, 1944, such additional taxes shall, at the option of the company and after sixty (60) days notice prior to the end of any fiscal month, be added to the schedule of rates contained herein; provided, however, that the customer shall have the right, if such option is exercised by the company, to cancel, at the end of any fiscal month upon sixty (60) days notice prior thereto, any contract executed under this schedule.
*675 16. Pursuant to a negotiated contract entered into between plaintiff and defendant under date of August 14,1942, plaintiff agreed to supply gas on an interruptible basis to plaintiff’s Louisiana Ordnance Plant near Minden, Louisiana. Tbe contract contained the following pertinent provisions:
❖ H* H« * ❖
(a) Service and Period. — That the said contractor shall, during the period commencing two weeks after the acceptance of this bid by Government, and until June 30, 1942 and thereafter until cancelled by the United States, furnish natural gas for the use of the United States at Louisiana Ordnance Plant, near Minden, Louisiana.
(b) Point op Delivery. — Approximately 1,600' south of Main Entrance to Govt. Reservation and approx. 900' south & east of Administration Building.
*****
(o) Unit op Measure. — That the unit of measure shall be per 1,000 cubic feet of gas as determined by the Bureau of Standards, Washington, D.O.
(p) Rates. — That the United States shall pay the contractor monthly the following rate for gas furnished:
$ none — minimum charge.
0.1484 net per unit for the first 5,000 units.
.13 net per unit for the next 5,000 units.
.12 net per unit for the next 10,000 units.
.11 net per unit for the next 10,000 units.
.10 net per unit for the next 10,000 units.
.09 net per unit for the next 10,000 units.
.08 net per unit for the next 70,000 units — added.
.06 net per unit for all over 120,000 units — added.
The net monthly bill will be determined by the application of a discount of five (5%) percent to the billing on the gross monthly rate on the first 30,000 units of gas used monthly, and ten (10%) percent to the billing on the gross monthly rate for all gas used monthly over 30,000 units. — added.
(q) Change op Rates. — (1) That if during the life of this contract the State Commission having jurisdiction receives for file in authorized manner rates that are higher or rates that are lower than those stipulated herein for like conditions of service, the contractor hereby agrees to continue to furnish gas as stipulated in this contract, and the United States hereby agrees to pay for such gas at the higher or lower rates from and after the date when such rates are made effective.
*676 (u) Special Conditions. — (1) Contractor agrees to construct the necessary high pressure pipe line, metering and regulating equipment, etc., without cost to Government, and will endeavor to the best of its ability to have gas service available at Louisiana Ordnance Plant within two weeks after the acceptance of this bid by Government. Contractor now has in its warehouse stock sufficient pipe, meters, regulators, and incidental material to construct this line, promptly upon acceptance by Government of this bid.
(2) Contractor proposes to construct, operate and maintain a combination 4%" and 6%" O.D. high pressure pipe line, approximately 2 miles in length, from Contractor’s 20" high pressure gas transmission line, north of [Reservation, to delivery point designated herein. There is attached map, showing route of proposed line and detail of 20" pipe line connection, which will allow gas to feed from either direction, in case of emergency.
(3) The cost of the above pipe line, with the necessary metering and regulating equipment, is estimated by Contractor at approximately $10,000.00.
(4) Contractor agrees to deliver a maximum of five million (5,000,000) cu. ft. of gas per day, or two hundred fifty thousand (250,000) cu. ft. of gas per hour. Contractor further agrees, on reasonable notice and assuming that the Louisiana Ordnance Plant will be operated for one year or more from that date, to increase its daily and hourly delivery capacities to said Plant by fifty (50%) per cent, without cost to Government.
(5) The rate quoted in Par. (p) of this contract, with a five (5%) per cent and ten (10%) per cent discount arrangement, is a special rate being offered Louisiana Ordnance Plant, since this plant is served directly off Contractor’s high pressure gas transmission system.
jfc * ifc % &
17. With respect to rate regulation in the years material here, the situation in Louisiana was similar to that which existed in Arkansas. By the terms of Order No. 941 of the Louisiana Public Service Commission, plaintiff was authorized to contract with individual industrial consumers under the following conditions:
Consumers other than those referred to in the next preceding paragraph of this order using gas for industrial purposes and those consumers who use gas under boilers *677 shall be served under special contracts, at rates to be agreed upon between the Utility and such consumers, provided, however, that in no case shall there be discrimination in rates as between such consumers engaged in the same character of business and using substantially the same quantities of gas under the same load factor and under the same circumstances, reserving to any party who may be aggrieved or who has cause to believe that he will be affected by said rate the right to file his protest with the Commission, and to be granted the right of hearing should the commission so decide.
18. Gas rates in the State of Louisiana for each class of customers have historically been and are lower than the rates for such customers in Arkansas. The Louisiana industrial customers are located much nearer the source of supply and, for that reason, the Louisiana Public Service Commission has refused to approve rates as high as are authorized for similar types of gas service in the State of Arkansas.
19. From 1942 through 1950, plaintiff had only five customers in Louisiana who could be classified as large industrial consumers. These were the Arkansas Fuel Oil Corporation, the Princeton Befining Company, the Atlas Oil and Befining Company, the Southwestern Gas and Electric Company, and the Louisiana Ordnance Plant, the Government installation referred to in finding 16.
With the exception of the Princeton Befining Company, the rate blocking in the contracts entered into between plaintiff and the private concerns named was identical, but there were variations in the provisions relating to minimum charges and discounts. These differences were due to the location of the customer in conjunction with the supply of gas or to the annual volume of gas consumed. The rates provided for in the contract between plaintiff and the Princeton Befining Company were somewhat higher than those charged to the other three industrial consumers named above because of the lower volume of gas consumed by the refining company.
20. The rates set forth in the contract covering defendant’s Louisiana Ordnance Plant were lower than the rates charged by plaintiff to any other large industrial customer in Louisiana and were also lower than the rates specified in the contracts for the Government plants in Arkansas.
*678 21. At all times pertinent to the counterclaim, the rates plaintiff could charge for gas sold to industrial consumers in the State of Texas were not regulated by the Texas Railroad Commission. Such rates were established on the basis of contracts negotiated at arm’s length between plaintiff and the customer concerned.
22. The defendant’s installations in Texas with which the counterclaim is concerned were the Lone Star Shell Loading Plant and the Red River Ordnance Depot, both located near Texarkana, Texas. With respect to these plants, it is the defendant’s contention that the plaintiff supplied natural gas under like conditions of service but at lower rates to the Arkansas oil refineries (previously referred to) and to the Lone Star Steel Company, located near Daingerfield, Texas.
23. Pursuant to a negotiated contract between plaintiff and defendant dated November 4, 1941, plaintiff agreed to supply natural gas service to defendant’s Lone Star Shell Loading Plant and to its Red River Ordnance Depot near Texarkana, Texas. The relevant portions of the contract are as follows:
# ❖ # # #
Whereas, the Contractor is a public utility engaged in the business of supplying natural gas service to private and public consumers in the States of Arkansas, Louisiana and Texas; and
WheReas, the Government and the Contractor are entering into a contract for the supplying by the Contractor to the Government of natural gas service for the operation of the boilers and miscellaneous cooking and heating equipment at the projects known as Lone Star Ordnance Plant and Red River Ordnance Depot located in area approximately eight miles west of Texarkana, Texas, hereinafter called Ordnance Plant and Ordnance Depot; and * * *
Now, Therefore, in consideration of the premises and of the mutual agreements herein contained, to be performed by the parties hereto respectively, it is agreed as follows: * * *
Article IV. — Refund Agreement
1. In consideration of the fact that the Contractor is to be reimbursed for a sum in lieu of the estimated cost of the facilities to be provided for Government use hereunder in the amount of $152,649.00 and the further con *679 sideration that title to said facilities is to be and remain in the Contractor, Contractor agrees to allow the Government monthly credits as hereinafter set forth and enumerated, such credits to continue until such time as the accumulated amount of such credits equals the amount of the connection charge, unless this contract shall have been previously terminated, except that if a new contract for the supply of gas service shall be entered into between the parties hereto within a period of fifteen months from the date of such failure to renew, the credit allowances shall resume and continue as first herein provided. Such credits shall be forty (40%) per cent of the monthly bills for gas consumed at Ordnance Plant and Ordnance Depot, computed at rate schedule set forth herein in Article XX.
2. Anything in this contract to the contrary notwithstanding, no refund shall be made the Government or credit allowed on Government bills, after five years from the date of this contract.
;js 3* H<
ARTICLE VI.- — TERM OF CONTRACT
1. This contract shall take effect as of the date of execution thereof and continue until further notice. Notice of intention to terminate this contract shall be at the option of the United States and shall be given in writing by the Contracting Officer to the Contractor not less than ninety (90) days in advance of the effective date of termination.
‡ ‡
Article XIV. — Change in Load
Reasonable notice will be given by each party to the other to any material changes proposed in the connected load in the reservation or on the line serving the reservation. The Government understands that the pipe line facilities to be provided hereunder by Contractor, with terminal pressures of fifty (50) pounds, will deliver to the Ordnance Plant a maximum of 180,000 cubic feet of gas per hour or 3,600,000 cubic feet of gas per day, and at the Ordnance Depot a maximum of 10,000 cubic feet of gas per hour or 200,000 cubic feet of gas per day, and that the additional capacity being built into the proposed line is for the sole use of Contractor.
Article XV. — Change of Schedule
The Contractor hereby agrees that if, after furnishing natural gas service for any ninety (90) day period *680 during the life of this contract, it would hare been more advantageous to the United States to have taken service under any other of the Contractor’s standard rate schedules in effect during any such period for like conditions of service to the class of service furnished hereunder, the rate shall be changed to conform to the schedule and an adjustment of the charges for the last of such periods shall be made, based on such schedule.
ÁRticle XVI. — Change op Kates
If during the life of this contract the State Commission having jurisdiction receive for file in authorized manner rates that are higher or rates that are lower than those stipulated herein for like conditions of service, the Contractor hereby agrees to continue to furnish natural gas service as stipulated in this contract, and the United States hereby agrees to pay for such natural gas service at the higher or lower rates from and after the date when such rates are made effective.
Article XVII. — Deductions
This contract contemplates that continuous service shall be furnished. Should Contractor desire to interrupt service for maintenance or repair purposes, arrangement therefor shall be made with the proper officials in order that such interruptions will least interfere with service for the Government.
If such arrangement is not made, and if the interruption is due to conditions within the control of the Contractor, deductions shall be imposed which will partially compensate the Government. For a shut-down lasting from three minutes to thirty minutes, 10 per cent of the cost of natural gas for the preceding day of similar service shall be deducted. For a shut-down of over thirty minutes, 25 per cent of the cost of natural gas for the preceding day of similar service shall be deducted.
Article XVIII. — Payments
1. For and in consideration of the faithful performance of the stipulations of this contract, the Contractor shall be paid by the designated disbursing officer for natural gas service herein contracted for, at the rates and under the terms and conditions hereinafter set forth; and the Contractor hereby declares that said rates are not in excess of the lowest rates now available to any prospective customer under like conditions of service.
*681 Article XX. — Nates
The schedule of rates which shall be charged for gas consumed by Lone Star Ordnance Plant shall be as follows:
Net Monthly Eate:
First 100 M.O.F. at $0.55 per M.O.F.
Next 500 M.O.F. at .25 per M.O.F.
Next 500 M.O.F. at .23 per M.O.F.
Next 1,000 M.O.F. at .21 per M.O.F.
Next 3,000 M.O.F. at .15 per M.O.F.
Next 3,000 M.O.F. at .14 per M.O.F.
All over 8,100 M.O.F. at .13 per M.O.F.
Minimum Charge: Entire gas requirements.
The schedule of rates which shall be charged for gas consumed by Ned River Ordnance Depot shall be as follows:
Gross Monthly Eate:
First 500 M.O.F. at $0.25 per M.O.F.
Next 500 M.O.F. at .23 per M.O.F.
Next 500 M.O.F. at .21 per M.O.F.
Next 4,500 M.O.F. at .19 per M.O.F.
All over 6,000 M.O.F. at .18 per M.O.F.
The net monthly bill will be determined by the application of a discount of twenty per cent (20%) to the billing on the gross monthly rate.
Minimum Charge: Entire gas requirements. * * *
24. As shown by the above-quoted provisions, the contract was not comparable to those entered into between plaintiff and its large industrial customers in Arkansas and Louisiana, nor was it comparable to the provisions relating to interruptible gas service in the contracts between plaintiff and defendant for the latter’s installations in Arkansas and Louisiana. Plaintiff was required to deliver a specified quantity of gas per hour to both the Lone Star Shell Loading Plant and to the Red River Ordnance Depot; was not authorized to interrupt the gas service except for maintenance or repair purposes, and was to be charged a penalty for any interruption due to conditions within its control. In addition, the gas was to be used not only for industrial purposes but in miscellaneous cooking and heating equipment. However, by supplemental agreements entered into in 1942, 1943, and 1947, respectively, plaintiff agreed to deliver to the shell loading plant a maximum of 252,000 cubic feet of gas per hour in lieu of the original maximum requirement *682 of 180,000 cubic feet per hour and to deliver at the Red River Ordnance Depot a maximum of 185,000 cubic feet per hour in lieu of the 10,000 cubic feet per hour originally specified. With respect to these additional quantities of gas, it was agreed that on peak days during the winter and upon one hour’s notice, the maximum volume of gas to be furnished could be curtailed to 200,000 cubic feet per hour at the shell loading plant and to 20,000 cubic feet per hour at the ordnance depot. In the same modification of the contract, the defendant agreed to install standby facilities at its own expense to supplement the gas supplied by plaintiff on peak days when deliveries were subject to reduction to the extent stated.
25. By contract dated October 2, 1944, plaintiff agreed to supply the Lone Star Steel Company at its plant near Daingerfield, Texas, gas for industrial purposes on an inter-ruptible basis. The provisions of the contract with respect to the monthly rate, terms of payment, and annual volume discount were identical with those provisions of the contract between plaintiff and defendant that covered the furnishing of interruptible gas at the Shumaker Naval Ordnance Plant. For a time, the gas was supplied by plaintiff from its main line.
26. In 1945 the Southern Natural Gas Pipe Line Company, a Texas corporation, contracted to purchase a supply of gas from producers in the Willow Springs and Harleton Gas Fields, located about 2 miles west of Longview, Texas. In order to dispose of the gas, the pipeline company entered into a contract with the Lone Star Steel Company on May 28,1945, by which the former agreed to construct a pipeline from the producing field near Longview to connect with the facilities of the steel company and to furnish it a supply of gas over a 10-year period in accordance with the terms of the contract in evidence as plaintiff’s exhibit 9. The rates to be paid by the steel company were substantially lower than the rates it had agreed to pay plaintiff for gas sold under the contract of October 2,1944.
About the time such transactions occurred, the vice-president and general manager of plaintiff made an offer to buy the gas from the owners in the Harleton Field and learned *683 that the Southern Natural Gas Pipe Line Company had already contracted to purchase the gas. Through negotiations between plaintiff’s manager and the officers of the pipeline company, a tentative agreement was made for plaintiff to purchase the gas in the Harleton Gas Field from the pipeline company. However, the Lone Star Steel Company would not release the pipeline company from the binding contract of May 28, 1945, unless plaintiff would assume the obligations thereof. As a result, the pipeline company was unwilling to dispose of its gas reserves in the Harleton Field to plaintiff unless it could be relieved of its contract obligations to Lone Star Steel. After further discussions, a three-party agreement was made whereby
(1) the pipeline company sold its reserves in the Harleton Field to plaintiff;
(2) plaintiff was required to and did enter into a written contract with Lone Star Steel substantially identical in terms to the contract of May 28, 1945, between Southern Natural Gas Pipe Line Company and Lone Star Steel, and
(3) Lone Star Steel released the pipeline company from the obligations it assumed in the contract of May 28, 1945.
27. The written contract which plaintiff and the Lone Star Steel Company entered into on July 1, 1945, upon the consummation of the agreements described in the preceding finding, contained the following pertinent provisions:
Whereas, Seller is in process of acquiring a supply of natural gas in the Harleton Area of Harrison County, Texas and Buyer desires to purchase natural gas from Seller for special purposes herein described;
Whereas, Defense Plant Corporation, hereinafter referred to as “Defense Corporation”, under an agreement with Lone Star Steel Company (Plancor 763), has undertaken the development of certain iron ore properties in Morris County and Cass County and adjacent counties in the State of Texas, included in which program has been the construction, near the town of Daingerfield, Texas, of an ore beneficiating plant, a power plant, a set of coke ovens, a blast furnace and various other auxiliary facilities; and
Whereas, in order to supply Buyer’s natural gas requirements at said plant in adequate quantities and at suitable pressures, Seller will, subject to the terms and conditions herein, construct an eight-inch gas pipe line *684 capable of supplying a minimum of 800,000 cubic feet of gas per hour, from a point in the said Harleton Field, to the Lone Star Steel Company Plant in Morris County, Texas.
Now Therefoeb, for and in consideration of the mutual benefits herein recited, said parties hereby contract and agree as follows: _
_ 1. Seller will proceed with all reasonable diligence to complete the construction of the aforesaid eight-inch gas pipe line, together with all necessary regulating and metering equipment. All such construction shall be executed by Seller at its expense and Seller shall, at all times herein contemplated, be deemed sole owner of all material and equipment incorporated in said line, appurtenant thereto, or hereafter salvaged therefrom. Seller will at all times maintain and operate said line at its risk and expense. It is understood that such construction requires the use of critical materials and skilled labor difficult to secure under war conditions, and Seller shall in no wise be liable to Buyer, Defense Corporation, the United States Government, or any other person, firm, corporation or agency whomsoever for delays in completion of such construction, but it shall proceed vigorously and shall exercise reasonable diligence in the completion thereof. This agreement however, shall be null and void, at Buyer’s option, if said gas pipe line is not completed by September 29,1945.
$ $ $ $ $
3. During the term hereof, the minimum monthly billing for gas shall be One Thousand Dollars ($1,000.00), which minimum amount of gas Buyer agrees to use or to pay Seller for if not used, as computed in accordance with the attached rate schedule, provided, however, that such obligation, during the first twenty-four (24) months hereof, shall not be applicable to any period or periods longer than one month, during which all substantial operations by Buyer of its plant near Dainger-field may cease or be interrupted.
4. Buyer shall have the right to purchase, subsequent to completion of Seller’s transmission line, under the terms and provisions of this agreement, and Seller shall have the obligation to supply, in the event Buyer exercises such right, not to exceed a total of 19,200,000 cubic feet of gas during each day of twenty-four (24) hours, but such right to purchase and Seller’s obligation to deliver the same shall not be cumulative from day to day.
*685 6. This contract is for an original term of ten years from date hereof, and supersedes all contracts and agreements for natural gas for the above stated purposes on the above described premises, and at the end of the original term automatically renews itself for successive periods of three years, unless terminated by either party by written notice delivered to the other not less than twelve months (12) in advance of the date upon which the original term or any three-year renewal term expires. The meters measuring gas to Buyer shall be read at intervals of about thirty days, called billing periods, and bills for service during each such billing period will be rendered at the address first stated above and are payable at Shreveport, Louisiana.
$ « $ $ $
8. Gas to be delivered under this contract shall be merchantable gas as produced in its natural state from the well or wells except that Seller may, before delivery of gas hereunder, extract the liquefiable hydro-carbons, provided, however, that in such extraction or separation the gas shall not be subjected to any treatment which will change the chemical composition of any of the component parts of said gas, permit the admission of oxygen, dilute such gas or reduce the heating content to a value of less than 950 British thermal units per cubic feet of gas saturated with water vapor, and Seller guarantees that such heat content shall not be less than 950 British thermal units per cubic foot of gas saturated with water vapor. Said gas shall contain not more than 30 grains of sulphur per hundred cubic feet and not more than 15 grains of hydrogen sulphide per thousand cubic feet of gas.
# $ * ❖ ❖
13. It is understood that Buyer is engaged in operating under a lease agreement with Defense Plant Corporation covering such ore plant, power plant, coke ovens, blast furnace and auxiliary facilities, and in the event of termination or cancellation of Buyer’s lease agreement with Defense Plant Corporation, this agreement shall terminate contemporaneously with the termination of such lease agreement, unless Buyer shall continue to operate said facilities by purchasing same or by leasing the same from any owner thereof.
*686 Nate Scheduie
Net Monthly Rate:
First 10,000,000 cu. ft. per month — 14$ per thousand cu. ft.
Next 10,000,000 cu. ft. per month — 10$ per thousand cu. ft.
All over 20,000,000 cu. ft. per month— 7$ per thousand cu. ft.
Minimum Charge: During each month of this contract Buyer agrees to take or pay for a net minimum of $1,000.00 worth of gas, subject to the provisions of Article 3 of this Contract.
Terms of Payment: The net monthly bill is payable on or before the twentieth (20th) day of the month succeeding that month in which service is rendered. If the bill is not paid by such date, an additional amount of 5% (but not to exceed $50.00) shall be added to the monthly bill.
Annual Volume Discount: If buyer uses, in any twelve months operating year, a total volume of 100,000 m.c.f. or more, Seller will return to Buyer at the end of such period, by reason of the use of such annual volume, an amount of money computed at the following rates: For consumption from and including 100,000 m.c.f. up to 200,000 m.c.f. per annum one cent ($0.01) per m.c.f.; for consumption from 200,000 m.c.f. to 300,000 m.c.f., two cents ($0.02) per m.c.f.; for consumption of 300,000 m.c.f. or more, three cents ($0.03) per m.c.f.
The monthly and annual rate under this schedule for any contract year shall not be less than an average of 6.5$ per m.c.f. for the first three years, 7.2$ per m.c.f. for the next two years, and 7.6$ per m.c.f. thereafter.
Service under this schedule is for the individual use of Buyer, and the natural gas so purchased shall not be resold except that Buyer is specifically permitted to utilize the gas so purchased in all buildings and houses used by Buyer in the operation of said plant or in houses at the plant site occupied solely by Buyer’s employees and which houses have been constructed or may be constructed directly in connection with the construction of the plant; provided that nothing herein contained shall be construed as prohibiting a lessee of Buyer from utilizing gas purchased under this contract.
* # iji # #
28. In accordance with its contract with Lone Star Steel, plaintiff was required to expend approximately $241,000 for the construction of 18 miles of pipeline to transmit the gas from the Harleton Field to the steel company’s facilities, although the facilities which plaintiff had previously used for supplying gas to the Lone Star Steel Company under the former contract of October 2, 1944, were adequate for furnishing the volume of gas called for under that contract. As previously stated, the new contract also required plaintiff to furnish the gas to the steel company at lower rates than were provided for in the former contract.
*687 Tlie evidence, as a whole, shows that plaintiff entered into the new arrangement primarily because of its desire to retain the steel company as its customer. If it had not assumed the contract made between the pipeline company and the steel company, plaintiff would have lost the Lone Star Steel Company as a customer and would not have been able to acquire the gas reserves in the Harleton Field. At the same time, plaintiff derived other advantages from the three-party agreement. All of the gas was to be supplied directly from the Harleton Field, which had adequate reserves for that purpose, and the gas could be transmitted without any expenses of compression. The Lone Star Steel Company agreed to use the gas in its natural state, whereas gas which is taken into the main line of plaintiff’s system must be processed for the removal of impurities and the dehydration of any water contained therein. Also, the steel company agreed to use a large volume of gas for an original term of 10 years and could not terminate the agreement unless its lease arrangement with the Defense Plant Corporation was cancelled. The steel company obligated itself to pay plaintiff a net minimum of $1,000 per month for the gas consumed by it with the understanding, however, that during the first 24 months of the contract term, the steel company would not be obliged to make the minimum payments when its operations ceased or were interrupted for a period or periods of longer than one month.
When plaintiff’s contract with the steel company ended, plaintiff was able to utilize the reserves of gas in the Harleton Field in its main-line transmission system by extending the pipeline to that system and by processing the gas to meet its main-line requirements.
29. Although it is theoretically possible for plaintiff to determine the cost of serving- any particular customer, it is not practicable to do so. For that reason, plaintiff’s rates to its several types of customers are generally set forth in separate schedules for each class of consumers provided for in the orders of the regulatory commissions in the three states which have jurisdiction over plaintiff. These classifications are based upon the principal characteristics of gas service which each group of customers will require.
*688 The two principal elements which determine plaintiff’s cost of serving a customer are, first, the demand or capacity costs and, second, the commodity costs. Capacity costs relate to the company’s physical system, including the gathering system, the pipelines, the compressor stations, and the various facilities needed to deliver the gas. The capacity costs consist of the expenses of operating and maintaining these physical facilities, plus a return on the investment in such facilities, plus income taxes on that return. Commodity costs include the actual cost of the gas itself, plus the variable costs of transporting a unit of gas to the place where the customer requires the service. During most of the period from 1942 to 1950, plaintiff’s capacity costs and the variable commodity costs of moving the gas from the field to the consumer exerted greater influence on the rates charged than the cost of the gas. However, in 1946, the price of gas in the area began to increase and the increase was reflected in plaintiff’s contracts beginning sometime in the year 1948.
30. The characteristics or conditions of service that affect the rates charged to plaintiff’s customers consist of the following:
(1) The quantity or volume of gas used.
(2) The consistency of use or the high level at which the volume of gas is consumed by the customer from day to day and from month to month throughout the year in relation to the facilities which plaintiff has constructed or made available to serve him. The measure of consistency of use is generally referred to as the “load factor” of the customer, a term which may be defined as the ratio of the average load over a designated period of time to the peak load occurring in that period. The customer with a high load factor is of particular benefit to the plaintiff, because its system is operating the maximum capacity during the winter season, whereas in the summer and during the warmer months of the year, the volume of gas required by many customers, such as residential and commercial customers, decreases considerably. It is more burdensome and more expensive for plaintiff to service the customer whose requirements for gas fluctuate, particularly if his consumption is high in winter and low in summer, because plaintiff’s capacity costs remain *689 about the same from day to day regardless of whether the facilities are consistently utilized for the delivery of a high volume of gas or for a volume which fluctuates from low to high by seasons.
(3) The distance the gas is transported. The distance which plaintiff has to transport gas to supply service affects plaintiff’s costs and rates. The cost is lower for the customer who resides at or near the wells from which the gas is obtained.
(4) The continuity with which the service must be rendered, i.e., whether firm gas must be supplied at all times, or whether plaintiff has the discretion to curtail or interrupt the volume of gas supplied when its system is under unusually heavy demand.
(5) The state in which the service is rendered.
(6) The type of gas required. It is cheaper for plaintiff to supply a customer with untreated gas directly from the producing field than, from its main line. In the main line, it is impossible to segregate gas which may go to a residential consumer from that which is used by an industrial consumer. To be suitable for main-line consumption, gas must be compressed to required pressures and must be processed to remove water and reduce excessive sulphur content.
31. Volume of gas consumed. During the period from 1942 to 1950, the five Government plants consumed a total of 13,688,076 M.C.F. of gas. This figure covers interruptible gas only at the Shumaker Naval Ordnance Plant, the Pine Bluff Arsenal, and the Louisiana Ordnance Plant, but includes both interruptible and non-interruptible gas at the Lone Star Shell Loading Plant and the Bed Biver Ordnance Depot.
During the same period of time, the six Arkansas oil refineries consumed 43,520,575 M.C.F. One of these, the Pan American Southern Corporation used 17,042,844 M.C.F. or more than the combined total for the Government installations.
While the record does not reflect the amount of gas consumed by other private industrial customers of plaintiff, the evidence does show that in this respect the Government installations would have been comparable to the Arkansas *690 industrial customers operating under the 3-B rate, if the Government installations had used gas at or near the maximum quantities plaintiff was obligated to supply. However, at the Shumaker Naval Ordnance Plant, the percentage of the actual daily consumption of interruptible gas to the daily maximum stated in the contract varied from a high of 6 percent in 1947 to a low of 3 percent in 1950. This plant was not completed until November 1945, after the end of the war, and never consumed gas at the level which was anticipated at the time of construction. At the Pine Bluff Arsenal, the range was from a high of 47 percent in 1943 to a low of 4 percent in 1946.
Records for the Lone Star Shell Loading Plant and the Red River Ordnance Depot necessarily include both inter-ruptible and non-interruptible gas. At the shell loading plant, the percentage of actual to maximum anticipated consumption varied from a high of 30 percent in 1944 to a low of 6 percent in 1949, and at the Red River Ordnance Depot from a high of 17 percent in 1942 to a low of 3 percent in 1946.
At the Louisiana Ordnance Plant, the percentage of actual use to the requirements anticipated by the contract varied from a high of 37 percent in 1944 to a low of 9 percent in 1950.
32. Consistency of use. Records showing the consistency of consumption of plaintiff’s gas throughout each of the pertinent years are contained in plaintiff’s exhibit 14 with respect to the Government installations and in plaintiff’s exhibit 15 with respect to the Arkansas oil refineries. The percentage of use during the lowest off-peak month to the high winter month for the Government installations as a group was 47 percent and for the Arkansas oil refineries as a group was 81 percent during the period involved here. The percentage of consumption during the off-peak season (May-October) to the consumption during the six months’ heating season (November-April) was 60 percent for the Government’s plants and 90 percent for the Arkansas oil refineries.
These figures represent the load factor for each of the two groups of customers, but the records for the individual *691 plants show that the Pine Bluff Arsenal, which had the highest load factor of any Government installation, made a better showing than the Lion Oil Eefining Company, the refinery with the lowest load factor in its group. At the arsenal, the percentage of gas used during the lowest off-peak month to the highest winter month was 64 percent and the percentage during the slack season to the heating season was 73 percent; comparable records for the Lion Oil Eefining Company were 40 and 70 percent respectively.
The evidence shows that as a group the Arkansas refineries used gas at a high and near-constant rate at all seasons of the year and that they had an unusually high load factor. The gas was used for the processing of crude oil, and the refineries operated 24 hours per day at a high level of consumption.
33. The distance the gas is transported. The rates provided for in the contract covering the Louisiana Ordnance Plant were the lowest rates available to any of plaintiff’s customers in Louisiana; they were lower than the rates charged to the other Government installations and lower than the rates made available to plaintiff’s industrial customers in Arkansas, with the exception of the oil refineries. The Louisiana Ordnance Plant is located on a 20-inch pipeline in an area adjoining a number of producing gas wells.
The Arkansas oil refineries were all located in oil fields which also produced considerable quantities of gas from 1942 until a short time prior to 1950. The refineries were much nearer the source of supply of gas than the Government plants and other industrial consumers in Arkansas.
The rates charged to the Louisiana Ordnance Plant would have been lower than those charged to the Arkansas refineries if the ordnance plant had consumed the maximum volume of gas which plaintiff was obligated to deliver. A comparison of the contract rates for the Louisiana Ordnance Plant with the contract rates for the Arkansas refineries shows:
(a) the rate for the first 3,500 M.O.F. per month at the ordnance plant was lower than the refinery rate;
(b) the refinery rate for the next 138,000 M.C.F. per month was lower than the ordnance plant rate, and
*692 (c) for gas consumed in excess of 141,500 M.C.F. per month, the ordnance plant rate was lower than the refinery-rate.
The evidence does not show how far the Lone Star Shell Loading Plant, the Red River Ordnance Depot, or the Lone Star Steel Company were from the source of the gas furnished by plaintiff, except that after July 1, 1945, the gas for the Lone Star Steel Company came from a field 18 miles from the steel plant.
34. Oontinuity of service. As previously explained, plaintiff’s right to curtail the gas supplied to its industrial customers during periods of peak demand was reflected in lower rate schedules for interruptible gas service to such industrial customers.
Plaintiff’s contracts for the Arkansas oil refineries, the Louisiana Ordnance Plant, the Pine Bluff Arsenal, and the Shumaker Naval Ordnance Plant, provided for interruptible gas service. The differences in the rate schedules for that type of service to these customers are shown in preceding findings.
The original contract covering the Lone Star Shell Loading Plant and the Red River Ordnance Plant required plaintiff to supply firm gas only. By supplements to the contract, plaintiff agreed to supply more gas and the extent to which it could interrupt the additional supply is shown in finding 24.
Under plaintiff’s first contract with the Lone Star Steel Company, in force from October 2,1944, to July 1,1945, the steel company was a main-line customer receiving interruptible gas service for industrial use at the same rates charged at the Pine Bluff Arsenal and the Shumaker Naval Ordnance Plant for interruptible service. After July 1, 1945, when plaintiff entered into a new contract with the steel company, the conditions of service at the plant, as well as the circumstances under which the new contract was executed, are shown in findings 26, 27, and 28.
35. The state m which the service is rendered. Plaintiff contracted to supply gas to Government plants in three states, each having its own regulatory agency. In recognition of the regulatory power of the state commissions, the contracts *693 contained provisions for changes in the rates as a result of regulation by the appropriate state agency. However, in the period pertinent to the counterclaim, only the Arkansas Public Service Commission regulated the rates at which plaintiff supplied gas to its industrial consumers and such regulation was limited to those industrial customers who were served from distribution systems in incorporated cities. Neither the Government plants nor the refineries in Arkansas were served from such city distribution systems. All were main-line industrial customers.
36. The type of gas required. With respect to the type of gas required, the conditions of service at all of the Government installations and the private plants pertinent to the counterclaim were similar, except for the Lone Star Steel Company. After July 1, 1945, the steel company was supplied gas in its natural form directly from the Harleton Field.
37. The contracts negotiated between plaintiff and defendant for the Pine Bluff Arsenal, the Shumaker Naval Ordnance Plant, Lone Star Shell Loading Plant, and Bed Liver Ordnance Depot contained provisions by which the Government advanced funds for the construction of connecting facilities between plaintiff’s distribution lines and the Government installations. The connections were to become the property of the plaintiff, but the money advanced by the Government was to be refunded by deductions from monthly bills over a period of time. These agreements resulted from the fact that during the wartime period the Government was anxious to get the defense plants in operation as quickly as possible and was willing to advance the capital for the construction of such facilities and permit plaintiff to refund the advance in the manner stated. If the funds had not been advanced by the Government, it would have been necessary for plaintiff to borrow money for the additional construction. No connection charge was made for the Louisiana Ordnance Plant. Plaintiff’s practice of having industrial customers advance capital for connecting facilities was not limited to the Government. In instances where the connecting facilities are so extensive that plaintiff must use borrowed capital for the construction, it has been customary for plaintiff to *694 take advances from industrial customers and to refund tbe money through deductions from the customer’s monthly bills. In many instances the connections are not the only additional facilities which are required to service large industrial customers. It is often necessary for plaintiff to increase the capacity of its distribution system by adding a compressor station, providing a loop, or in some cases, by obtaining an additional supply of gas from the field. Plaintiff frequently obtains advances from realtors who are engaged in the development of large subdivisions under an arrangement by which the advance is refunded when the individual householder’s connections are made. The Arkansas Power and Light Company, one of the larger industrial customers of plaintiff, advanced 3y2 million dollars to provide additional facilities for serving it.
The contracts in evidence between plaintiff and the sis Arkansas oil refineries contain no provisions for advances by the customers for connection charges. However, they are annual contracts, representing renewals of prior agreements. The evidence does not show whether the original contracts provided for advances for connections, or whether the location of the refineries with respect to plaintiff’s distribution system was such as to require connecting facilities comparable to those needed for the Government installations.
Plaintiff did not require the Lone Star Steel Company to advance money for the construction of the 8-inch pipeline from the Harleton Field to the steel company’s premises.
38. The following table shows the cost of monthly gas consumption of eight of plaintiff’s customers in quantities ranging from 1,000 M.C.F. to a maximum of 150,000 M.C.F. at the contract rates and illustrates the differences in rates between private customers and the Government plants, as well as the differences in rates between the Government installations.
39. The trial was limited to the issues relating to the right of defendant to recover on its counterclaim.
*695 [[Image here]]
CONCLUSION OF LAW
Upon the foregoing findings of fact, which, are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and it is therefore adjudged and ordered that plaintiff recover of and from the United States the sum of thirty-three thousand one hundred forty dollars and fourteen cents ($33,140.14).
The court further concludes that the defendant is not entitled to recover and, accordingly, its counterclaim is dismissed.

 Public Utilities Commission of California v. United States, 355 U.S. 534 (1958) ; Hughes Transportation, Inc. v. United States, 144 Ct. Cl. 200, cert. denied 359 U.S. 968; Alabama Highway Express, Inc. v. United States, 146 Ct. Cl. 594.